UNITED STATES of America

v.

Edward G. REDOVAN, M.D.

Civ. A. No. 86–3074.

United States District Court,
E.D. Pennsylvania.

Nov. 5, 1986.

Virginia Powel, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Gilbert B. Abramson, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

The Court has now considered the testimony that has been presented in this case, as well as arguments of counsel for both sides, and is prepared to make its Findings of Fact and Conclusions of Law and Decision.

### FINDINGS OF FACT

1. Defendant, Edward Gregory Redovan, M.D., is a thirty year-old doctor serving a pre-residency fellowship in ophthalmology at Soll Eye Associates in Philadelphia, Pennsylvania.

2. On April 10, 1979, Redovan, then a medical student at the Temple University School of Medicine, applied for a scholarship award through the National Health Service Corps (NHSC) Scholarship Program.

3. The Scholarship Program was established by Section 751 of the Public Health Act, currently codified at 42 U.S.C. § 254l.

4. Also on April 10, 1979, Redovan intelligently and voluntarily executed a NHSC Scholarship Program Contract in which he agreed to serve one year of obligated service for each year the scholarship award was provided, with a minimum obligation of 2 years. The contract also specifically provided and Redovan agreed to:

4. Serve in the full time clinical practice of his or her profession (a) as a commissioned officer in the Regular or Reserve Corps of the Public Health Service or as a civilian member of the Corps in a health manpower shortage area designated under Section 332 of the Public Health Service Act to which the applicant is assigned.

5. Redovan subsequently applied for continuation of the NHSC Scholarship for the academic years of July 1, 1980 through June 30, 1981 and July 1, 1981 through June 30, 1982. In accordance with the scholarship application and continuation applications, scholarship awards were made by the NHSC totalling $42,846.00.

6. Under the terms of the Scholarship Contract, Redovan was obligated to serve three (3) years in the National Health Service Corps following completion of his academic training.

7. Redovan graduated from medical school in June 1982 and commenced a one year post graduate clinical program in general surgery at Albert Einstein Hospital. The NHSC granted Redovan a one year deferment of the commencement of his service obligation for the period of July 1, 1982 through June 30, 1983. Before Redovan began his general surgery residency, he knew that the residency program entitled him only to a one year deferment in his service obligation to NHSC.

8. At the time of the agreement to the deferral, NHSC advised Redovan that scholarship recipients who request one year deferments to train in general surgery must provide documentation that the surgery rotation included at least 3 months of primary care rotations in internal medicine,

pediatrics or emergency room. Redovan was specifically advised that, "No more than one year of general surgery training will be approved."

9. In July or August, 1982, Redovan was provided by the NHSC with a Site Selection questionnaire so that he could indicate his placement preference for serving his obligation to the Public Health Service upon expiration of his one year deferral.

10. Redovan failed to complete the site selection questionnaire and submit it to the NHSC until late February 1983. Seven months elapsed between the time Redovan received the site selection questionnaire and the time he submitted the completed questionnaire to NHSC. By the time NHSC received Redovan's site selection questionnaire NHSC had, for some months, been involved in assigning other scholarship participants to NHSC sites. Thus, when Redovan finally submitted his questionnaire, most, if not all, of the popular regions within the NHSC had been filled. As a consequence, Redovan was assigned to the Indian Health Service ("IHS"), in the North Dakota, South Dakota and Montana region. The public health service believed that this assignment allowed the best use of Redovan's qualifications to fill the greatest need.

11. Redovan was assigned to the IHS and that particular geographic area according to the normal procedures of the Public Health Service for those individuals not otherwise assigned at that late date.

12. On March 9, 1983, Redovan was notified of his assignment to the Indian Health Service in the IHS Aberdeen, South Dakota or Billings, Montana areas. Redovan was advised to contact recruiters in the two areas to complete the placement process, and was advised of his options to serve either in the Commissioned Corps of the Public Health Service or under the Civil Service.

13. On June 13, 1983, Redovan informed the NHSC, through John T. Gimon, Acting Chief, Physician Recruitment, Retention and support Branch of the NHSC Program, of his intention to default on his service obligation.

14. On July 20, 1983, upon Redovan's failure to commence his service obligation on July 1, 1983, Redovan was placed in default of his service contract.

15. On July 20, 1983, Redovan was advised that, due to his default, he was required to pay three times the amount of all NHSC Scholarship funds paid to him or on his behalf plus interest, subject to credits for service actually performed. Redovan was also advised that, pursuant to the Scholarship Contracts he had entered into, that interest accrued from the date of each scholarship payment made to him or on his behalf, said interest accruing at the maximum prevailing rate as determined by the Treasurer of the United States. As of the date of default, July 1, 1983, Redovan owed $172,041.92 representing $125,538.00 in tuition, stipends and other costs, plus interest of $46,503.92. Redovan was requested to repay this amount by June 30, 1984, i.e. within one year of the default, in accordance with the Contracts he had signed.

16. Redovan did nothing to attempt to cure his default or work out some arrangement to do so agreeable to the NHSC for nine months. Finally, by letter dated April 27, 1984, Redovan acknowledged his breach of contract and expressed his wish to complete his service obligation after the completion of his five year surgical residency, in blatant disregard of the known policy to allow only one year of deferral for surgical residencies.

17. Redovan was advised on June 14, 1984, that the NHSC might permit him to serve in lieu of repayment if he agreed to accept an assignment within 6 months, at a site selected by the NHSC, and if he completed a Forebearance Agreement and returned same to the NHSC within two weeks. Redovan did not return the Forebearance Agreement as specified.

18. On November 30, 1984, Redovan was again reminded that he was in default, that his financial obligation, by then $202,853.28 was due by December 30, 1984. Another Forebearance Agreement was sent him, if he wishes to serve his obligation

with the NHSC instead of financial repayment.

19. By letter dated January 18, 1985, Redovan again requested that he be permitted to serve his obligation in lieu of repayment. By letter dated February 12, 1985 from the NHSC, Redovan was again advised that he would have to submit a notarized Forebearance Agreement within 2 weeks, Redovan was also advised that, "Your signed and notarized FA means that you agree to fulfill your obligation as a primary care health professional in a high priority health manpower shortage area to be determined by NHSC," and that, pending receipt of the Forebearance Agreement and acceptance of the agreement by the Division of Health Services Scholarships (DHSS) he would remain in a default status. Although Redovan did not submit the Forebearance Agreement within 2 weeks, a signed and notarized Forebearance Agreement was approved by DHSS on March 21, 1985.

20. Pursuant to the notarized Forebearance Agreement, Redovan agreed as follows:

Edward G. Redovan, M.D. agrees to fulfill his National Health Service Corps (NHSC) service obligation as a primary care health professional in a high priority health manpower shortage area to be determined by the NHSC, notwithstanding the regular matching process and other placement policies and practices. Such service must begin on or before six months from the effective date of this agreement....

21. When Redovan signed the Forebearance Agreement in March 1985, he had decided that he would leave his surgery residency in June of 1985 and ostensibly was planning to fulfill his service obligation starting then. He knew that a position would be available at the Punxsutawney Area Hospital in Punxsutawney, Pennsylvania, a designated health manpower shortage area in rural Western Pennsylvania, and that the Hospital Administrator was interested in having Redovan fill the position.

22. In accordance with the Forebearance Agreement entered into by the parties, Redovan was assigned to the IHS and on July 3, 1985, Redovan was notified by mailgram of his assignment. Redovan was given 5 work days from receipt of the mailgram to accept the assignment. Redovan's assignment was not inconsistent with the terms of his Forebearance Agreement. He was assigned to the IHS for the same reasons as the first time, and in addition so that he would not benefit and receive preferential placement at the expense of another participant in the NHSC program who was not in default of his or her obligation.

23. On July 22, 1985, Redovan contacted John T. Gimon of the NHSC and stated his intention to default on the assignment to the IHS. Redovan refused the assignment because it was inconvenient, it was distasteful to his wife, and because he felt it would place a strain upon his marriage.

24. As a result of Redovan's refusal to take the assignment to the Indian Health Service, he was again placed in default on July 26, 1985, and again notified of his obligation to repay the debt by letter from DHSS dated August 13, 1985.

25. On January 3, 1986, Redovan again completed a Forebearance Agreement and requested that he be permitted to serve his obligation in lieu of repayment of the debt.

26. However, as of the date of trial, Redovan has failed to accept any assignment for completion of his service obligation in lieu of repayment and has made no payments towards the debt. Redovan remains in default of the NHSC Scholarship contract. As of the date of trial, the amount due from Edward Redovan, to the United States is $244,649.37.

27. From the time he began medical school, through the default on his service obligation then and the prosecution of this action, up til the present day, Redovan has remained in Philadelphia, Pennsylvania and has performed no service under his service obligation. While he agreed to perform as a condition of receiving his scholarship for a medical education, he has not performed any service, and he has not at any time been coerced to perform any service.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1345 and venue is proper in that the defendant, Edward G. Redovan, M.D. is a citizen and resident of this District.

### 2. *The Statutory Program*

The NHSC Scholarship Program, first enacted in 1970 by Pub.L. 91–623 and replaced by Pub.L. 94–484, effective October 1, 1977, was enacted by Congress for the express purpose of assuring an adequate supply of trained health professionals for service in the NHSC in geographic area of health manpower shortages. The NHSC Scholarship Program's statutory authority may be found at Section 751 *et seq.* of the Public Health Service (PHS) Act, 42 U.S.C. § 294t *et seq.;* redesignated, as amended, § 338A *et seq.* of the PHS Act, 42 U.S.C. § 254*l et seq.* by Section 2709(a) of Pub.L. 97–35, effective August 13, 1981. (Further citation will be to the U.S.Code provisions.) The implementing regulations are contained at 42 C.F.R. Part 62.

Congress charged the Secretary of Health and Human Services with the responsibility of identifying geographic areas experiencing a shortage of health manpower and designating such areas as "health manpower shortage area." 42 U.S.C. § 254e. The Scholarship program is an attempt by Congress to supply health services to such shortage area. The program was not designed to subsidize the medical education of physicians, but rather:

> The Committee wishes to emphasize in the strongest possible terms that it does not view the National Health Service Corps scholarship program as a mechanism solely intended to subsidize health professional education. Rather, in return for substantial subsidization of the costs of education, the Committee views the National Health Service Corps Scholarship program as a means to overcome a geographic maldistribution of health professionals.

Senate Report 94–887, 94th Cong. 1st Sess. p. 201 (1975).

The conditions for eligibility for the scholarship program require applicants to submit an application and to sign and submit a written contract to accept the scholarship and to serve for the applicable period of obligated service in a health manpower shortage area. 42 U.S.C. § 254*l* (b).

██ The contracts signed by the applicant provide for the government to pay tuition, fees and reasonable costs for each year of medical education in return for an applicant's agreeing to serve in a health manpower shortage area for one year for each scholarship year. 42 U.S.C. § 254f. The ultimate decision of where to place the applicant when it comes time for him to serve his obligation is left to the discretion of the Secretary. However, the Secretary is obligated by statute to "seek to assign to an area a Corps member who has (and whose spouse, if any, has) those characteristics which are characteristics which increase the probability of the member's remaining to serve the area upon completion of his assignment period." 42 U.S.C. § 254f(f). This obligation of the Secretary does not, however, provide an applicant with a right to any particular placement. Rather, it constitutes a mandatory consideration in the overall administration of the assignment process.

As Redovan received scholarship awards for three years from the NHSC, he was obligated to serve 3 years as a commissioned officer in the Public Health Service or as a civilian member of the Service. Redovan's period of service was to have commenced upon his graduation from medical school, namely in July of 1982. 42 U.S.C. § 254m(b)(5)(A). A deferment was sought by Redovan and granted by NHSC for one year to allow Redovan to complete advanced clinical training. 42 U.S.C. § 245m(b)(5)(A); 42 C.F.R. § 62.9. Requests for deferments for training in general surgery for periods in excess of one year are subject to the discretion of the NHSC and will be granted only if they are consistent with the needs of the NHSC. 42 U.S.C. § 254m(b)(5)(A). The NHSC has determined that general surgery is not a needed specialty which would support a

126

deferral in excess of the one year granted to Redovan. That determination was within the discretion of the NHSC and will not be set aside by this Court.

Upon the expiration of the approved deferment in July of 1983, Redovan was required to commence service of his three year obligation. 42 U.S.C. § 254m; 42 C.F.R. § 62.9(e). Redovan has not done so to date.

■ If a recipient breaches his written contract by failing to begin or complete his scholarship service obligation, he is placed in default. Once the recipient is in default status, the service option terminates and the recipient must repay the debt financially. 42 U.S.C. § 254o (b)(1); 42 C.F.R. § 62.10(c). The relevant provisions of the statute provide that the defaulter must repay within one year damages equal to three times the amount of the scholarship award plus interest after taking into account any service performed. Redovan is not entitled to any adjustment in the debt as he has not performed any service in the Public Health Service, the NHSC or the IHS.

42 U.S.C. § 254o (b)(1) specifically provides that:

... The United States shall be entitled to recover from the individual an amount determined in accordance with the formula

$$A = \frac{3o(t-s)}{t}$$

in which 'A' is the amount the United States is entitled to recover, 'O' is the sum of the amount paid under this subpart to or on behalf of the individual and the interest on such amount which would be payable if at the time it was paid it was a loan bearing interest at the maximum legal prevailing rate, as determined by the Treasurer of the United States; 't' is the total number of months in the individual's period of obligated service; and 's' is the number of months of such period served by him in accordance with section 338B or a written agreement under section 338C. Any amount of such damages which the United States is entitled to recover under this subsection

shall, within the one year period beginning on the date of the breach of the written contract, be paid to the United States. 42 U.S.C. § 254o (b)(1).

The total amount due from Redovan to the United States as of the day of trial under this formula, including interest, is $244,649.37.

### 3. *Defendant's Due Process and Equal Protection Challenges*

■ Redovan challenges the validity of various aspects of the statutory scheme creating the National Health Service Corps and their application to him on due process and equal protection grounds. First, he appears to contend that the NHSC's conduct in assigning him to the Indian Health Service in the Dakotas and Montana region was arbitrary, irrational and motivated by bad faith. The record is devoid of facts to support the contention. The service and region to which Redovan was assigned is one of the most critically underserved of the designated health manpower shortage areas, and could best be served by someone with one year of general surgery training. There is also no evidence to indicate that his assignment to the Indian Health Service and not the Punxsutawney Hospital was motivated by bad faith or ill will. Neither was it inconsistent with the statutory mandate to place individuals in locations in a manner which will serve the long-term medical needs of the community. 42 U.S.C. § 254f(f). Such a requirement must be viewed from the perspective of the entire program. The long-term needs in administering this large assignment process cannot be viewed to create rights to particular assignments in particular individuals. In so assigning Redovan, the NHSC acted in accordance with its mandate and within its discretion.

■ The defendant next contends that the damage provision of the statute, 42 U.S.C. § 254o is on its face violative of due process because it is unfair and unreasonable. I disagree. The purpose of the program of which the damage formula is a part, is to provide valuable medical services to area in dire need of such services. The

need to encourage those medical professionals who obtain a long-term benefit far greater than the cost of their education to provide care in these critically underserved areas is obvious, and it is not unfair or unreasonable for the government to attempt to encourage doctors to perform their obligations. In addition, as I will explain in greater detail in a few moments, I believe that, although onerous, the damage provision is a reasonable estimate of the harm suffered as a result of default on a service obligation. I therefore conclude that it does not violate the due process clause.

■ Redovan also contends that the damage provision of the statute violates equal protection of the laws, because it permits wealthy individuals to pay money in lieu of their service obligation, but "subject[s] those like Redovan who are unable to pay the penalty to different justice." Defendant's Proposed Conclusion of Law Number 15. The short response to this proposition is that statutes which have the effect of discriminating on the basis of wealth have never been recognized to violate equal protection in the context of civil cases. The case cited by the defendant, *Bearden v. Georgia*, 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983), stands as an application of the general principle that the state cannot deprive criminal defendants of liberty differentially based on wealth.

### 4. *Substantial Performance and Estoppel*

■ Redovan next contends that he tendered substantial performance of the contract by being ready, willing and able to perform his service at Punxsutawney Hospital, which is located in a health manpower shortage area in Western Pennsylvania. As a result, he argues, the NHSC's rejection of his tendered performance bars the United States' recovery on the NHSC contract, and discharges his obligation on the contract. *See* 5A Corbin on Contracts § 1233 at 519–20. Defendant similarly asserts the equitable doctrine of estoppel. This argument is clearly misguided. Redo-

van agreed, before he accepted the scholarship money, to serve where he was assigned by the NHSC. The contract so provides, as do the various Forebearance Agreements he executed. It is ludicrous to now assert that willingness to serve only where Redovan finds it convenient or desireable constitutes substantial performance of his obligation. To allow this would undermine the intention of the NHSC program, which is to correct maldistribution of medical care in the United States. Presenting oneself for service where one wishes to serve, without regard for the needs of the program, does not constitute substantial performance. Redovan is not discharged from his obligation under the contract and the statute, and the United States is entitled to pursue its statutory and contractual remedy.

### 5. *The enforceability of the Statutory and Contract Damage Clause*

■ The third contention of the defendant is that the treble damage provision contained in the statute and his agreement with NHSC is void and unenforceable because it is a penalty. The United States takes the position that the clause is a valid stipulation of liquidated damages. All cases addressing the enforceability of this provision of which I am aware have agreed that the clause is indeed enforceable. *United States v. Bills*, 639 F.Supp. 825 (D.N.J. 1986); *United States v. Hayes*, 633 F.Supp. 1183 (M.D.N.C.1986); *United States v. Swanson*, 618 F.Supp. 1231 (D.Mich.1985). I have made my own independent assessment of the question in light of the facts before me and the cases reported and conclude that the provision is an enforceable damage provision.

■ In construing liquidated damages provisions in United States contracts, the court must apply principles of general federal contract law. *See Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947); *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731 (1907). And generally, it is permissible to allow the enforcement of liquidated damages provisions where the

actual damages are uncertain in amount but demonstrable, as is often the case with government contracts. As the Supreme Court wrote in *Priebe, supra,* at 411–412, 68 S.Ct. at 125–126:

> Today the law does not look with disfavor upon "liquidated damages" provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced.... They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts.... And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract. (Citations omitted).

In addition, various multiple damage provisions have been upheld against the claim that they are punitive. Some of these are outlined in the *Hayes* case at page 1186.

I conclude that the damage provision contained in the contract and the statute is a valid and enforceable provision, because I simply am unable to find that it is disproportionate to the injury inflicted on the United States by Redovan's failure to perform. First and most obviously, the government has lost and must recover the money provided to Redovan for his education, costs and living expenses. That aspect of damage is simple to ascertain. However, the other costs imposed on the United States are decidedly less easy to measure.

By defaulting on his service obligation, Redovan has deprived the United States of the services of a physician in a critically underserved location. As Judge Thompson observed in *Bills* at 831,

> "One cannot readily estimate the damages occasioned by the ... loss of a doctor's services in an area determined to be medically underserved."

"A physician ... is not a fungible handyman." *Swanson* at p. 1243.

Redovan's selfish conduct results in additional burdens on those already overburdened doctors providing medical care in the health manpower shortage area to which he was assigned. It requires citizens in that area to continue to suffer for the lack of adequate numbers of trained medical professionals. And in addition, his refusal to live up to his obligation subverts the lauditory goal of curing the maldistribution of medical care in the nation. For all of these reasons, I am unable to conclude that the liquidated damage provision is unreasonable or disproportionate to the harm suffered because of Redovan's breach.

Further, I should also consider the likely expense of hiring a similarly trained physician to serve for three years in the location to which Redovan was assigned. Viewed in that light, I find the liquidated damages provision to be a reasonable estimate of the harm caused by defendant's breach.

Defendant contends that the damage provision intended to ensure performance and not to compensate reasonably for the harm caused. Because I conclude that the damage provision is indeed a reasonable prior estimate of harm caused, the fact that it also encourages performance of the service obligation does not defeat the provision.

### 6. *The Thirteenth Amendment*

Defendant's final contention in opposing the suit is that the damage provision of the NHSC statute and contract violates the thirteenth amendment's prohibition of involuntary servitude. Section one of the Thirteenth Amendment provides as follows:

> Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Subsequent federal legislation enacted to enforce the Thirteenth Amendment prohibited the practice of "peonage", which is defined as "compulsory service in payment of a debt. A peon is one who is compelled to work for his creditor until his debt is paid." *Bailey v. Alabama,* 219 U.S. 219, 242, 31 S.Ct. 145, 152, 55 L.Ed. 191 (1911). As the Supreme Court observed in *Clyatt v. United States,* 197 U.S. 207, 215–16, 25 S.Ct. 429, 430, 49 L.Ed. 726 (1905):

"A clear distinction exists between peonage and voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject, like any other contractor, to an action for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of the service."

■ In the case before me, it is abundantly clear that Redovan has not been compelled to perform or continue any service whatever. Instead, he has chosen not to perform any service whatever. He has remained in Philadelphia and not reported to his assigned place of service. Because the Government has not sought to compel service—and Redovan may choose to have a civil money judgment entered against him in lieu of service—the enforcement of the government's rights in this lawsuit does not constitute peonage or some other form of involuntary servitude.

Indeed, the rights the government seeks to enforce in this action are for a money judgment. Peonage, or the coerced service of labor in payment of a debt, is not implicated. Rather, this case presents the converse, that of payment of a debt in the place of an agreed upon service obligation.

The peonage cases cited by the defendant are readily distinguishable. From *Clyatt v. United States* in 1905, and, *Bailey v. Alabama*, in 1911, to *United States v. Mussry*, 726 F.2d 1448 (9th Cir.1984), the touchstone of involuntary servitude has been "law or force compel[ling] ... service." *Bailey* and the line of similar cases involve the use of criminal sanctions which employ presumptions to convert breach of a contract into a criminal offense, with the purpose of compelling labor. *Mussry* involved non-English speaking Indonesian workers allegedly held by a private party against their will, who were required to work off their debts which arose from transportation to the United States. The court concluded that, if the allegations were proved, these individuals were truly coerced into performing labor to pay off a debt. In so concluding, the *Mussry* court ruled that, "in determining the question of involuntariness, the court should consider whether the challenged conduct would have had the claimed effect upon a reasonable person of the same general background and experience." 726 F.2d at 1453. All of the cases cited by the defendant involved unfortunate individuals, some of whom were illiterate and even unable to communicate in English, who were ill equipped to understand the scope of the obligation they entered into until the die was cast. Redovan can hardly claim to be in a similar position. He understood the nature of the obligation before he entered into it as an educated professional.

Further, as I concluded earlier, the damage provision is a reasonable estimation of the harm caused by defendant's default. Because defendant is required to make recompense for the harm, and he is unable financially to do so, he claims that the damage provision coerces his involuntary servitude. It is clear, however, that in assessing damages for breach of a contract, the court is not required to consider the breaching party's ability to pay, in order to stay within constitutional bounds. The fact that the consequences of a large money judgment may encourage Redovan to perform a service obligation does not convert him into a peon.

For all of these reasons, the defense of involuntary servitude fails, and judgment will be entered for the United States.

An appropriate Order follows.

### ORDER

AND NOW, this 5th day of November, 1986, it is hereby ORDERED that judgment is entered in favor of the United States and against Edward Gregory Redovan, in the amount of $244,649.37, with interest on the judgment at the legal rate.