987 F.2d 989
 61 USLW 2576, 81 Ed. Law Rep. 734
 Lynn Ann STEIRER, a Minor, by Barbara and Thomas STEIRER, as
Guardians and in Their Own Right; David Stephen
Moralis, a Minor, by Thomas and Barbara
Moralis, as Guardians, and in
Their Own Right
v.
BETHLEHEM AREA SCHOOL DISTRICT; Thomas J. Dolusio; Ellen
Pagano; Barbara Huth; Joseph McCarthy; John Spirk, Sr.;
Ruth Prosser; Uriel Trujillo; Lawrence Kisslinger; Lynn
Glancy; Robert Thompson.
Barbara and Thomas Steirer, as Parents and Guardians of Lynn
Ann Steirer, a Minor, and Thomas and Barbara
Moralis, as Parents and Guardians of
David Stephen Moralis, a
Minor, Appellants.
 No. 92-1359.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 3, 1992.
Decided March 15, 1993.
 
 Robert J. Magee, Eric R. Strauss (argued), Worth Law Offices, Allentown, PA, for appellants.
 Michael I. Levin (argued), Cleckner & Fearen, Willow Grove, PA, for appellees.
 Thomas A. Bowden, Blum, Yumkas, Mailman, Gutman & Denick, P.A., Baltimore, MD, for amicus-appellants Ass'n for Objective Law.
 Richard McMillan, Jr., Barry E. Cohen, William D. Wallace, Stuart Woolman, Crowell & Moring, Washington, DC (Elliot Mincberg, Deanna Duby, People For the American Way, Washington, DC, of counsel), for amicus-appellees, Nat. School Boards Ass'n; Pennsylvania School Boards Ass'n; Com. of Pennsylvania, People For the American Way, Youth Service America, Nat. Service Secretariat, Maryland Student Service Alliance; Nat. Women's Law Center, Carnegie Foundation, Bloomfield Hills School Dist., American Alliance of Rights and Responsibilities.
 A. David Baumhart, III, Hill Lewis, Birmingham, MI, for amicus-appellee Bloomfield Hills School Dist.
 McCarter & English, Newark, NJ, for amicus-appellee Carnegie Foundation for Advancement of Teaching.
 Before: SLOVITER, Chief Judge, STAPLETON and LAY*, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 May a public high school constitutionally require its students to complete sixty hours of community service before graduation? On this issue of first impression for an appellate court, plaintiffs, two high school students and their parents, argue that the mandatory community service program compels expression in violation of the First and Fourteenth Amendments and constitutes involuntary servitude in violation of the Thirteenth Amendment. The district court rejected both challenges. We have jurisdiction under 28 U.S.C. § 1291 (1988).
 
 I.
 FACTS AND PROCEDURAL HISTORY
 
 2
 The facts are not in dispute. On April 30, 1990, the Bethlehem Area School District, by a majority vote of its Board of Directors, adopted a graduation requirement that every public high school student, except those in special education classes, complete a total of sixty hours of community service during the student's four years of high school. These hours may be completed after school hours, on weekends, or during the summer. Students must complete this requirement through participation in a course entitled the "Community Service Program" (the Program), which requires them to "perform sixty (60) hours of unpaid service to organizations or experiential situations approved by the Bethlehem Area School District." App. at 182.
 
 
 3
 The stated goal of the Program is to "help students acquire life skills and learn about the significance of rendering services to their communities ... [and] gain a sense of worth and pride as they understand and appreciate the functions of community organizations." App. at 182. The four objectives of the Program are described in the Curriculum Course Guide as:
 
 
 4
 1. Students will understand their responsibilities as citizens in dealing with community issues.
 
 
 5
 2. Students will know that their concern about people and events in the community can have positive effects.
 
 
 6
 3. Students will develop pride in assisting others.
 
 
 7
 4. Students will provide services to the community without receiving pay.
 
 
 8
 App. at 193.
 
 
 9
 The Program is jointly administered by the high school principal, the district coordinator, and the school counselor. In addition, parents are "fully informed" of the Program and are expected to encourage their children to successfully complete the sixty hours of service, to encourage them to continue performing community service after completing the course requirements, to assist in identifying appropriate organizations or experiential situations, and to provide transportation to the placement site. App. at 186.
 
 
 10
 The Program maintains an extensive list of more than seventy approved community service organizations including, inter alia, AIDS Outreach, Bethlehem Special Olympics, Cedarbrook Nursing Home, Easton Area YWCA, Great Valley Girl Scout Council, Inc., Interfaith Peace Resource Center, Kemerer Museum, Lehigh County Meals on Wheels, Muscular Dystrophy Association, Planned Parenthood of North East Pennsylvania, The Experiment in International Living, Touchstone Theatre, and Wildlands Conservancy. App. at 191. The list of potential community service organizations is open-ended; students and parents are encouraged to submit the names of other potential organizations to the district coordinator for screening and approval. App. at 186, 191. Any organization that (i) "demonstrate[s] [its] intention to promote the welfare of the community"; (ii) does not "discriminate against any race, religion or sex"; and (iii) "provide[s] assurances that the[ ] organization is free from doctrinal motivation" can participate in the Program. App. at 191.
 
 
 11
 As an alternative to providing service to an approved community service organization, a student may choose to participate in an "experiential situation." App. at 192. This option allows a student to "develop [his or her] own individual community service experience." Id. This alternative experience requires parental approval, the recommendation of the school counselor, and verification by a responsible adult. Id. It may involve the arts, community special events, aid to the elderly, the handicapped or the homeless, emergency services, the environment, library/historical research, recreation activities, or tutoring. Id.
 
 
 12
 After completing the sixty hours of community service, the student must complete a written Experience Summary Form describing and evaluating his or her community service activity.[1] Once the school counselor (i) certifies that the sixty hours of service were completed; and (ii) reviews and approves the student's Experience Summary Form, the student receives half a unit of course credit and a grade of Satisfactory (S).[2] A student who does not satisfactorily complete the Program will not receive a high school diploma.
 
 
 13
 Barbara and Thomas Steirer and Thomas and Barbara Moralis, individually and as parents and guardians of Lynn Ann Steirer and David Stephen Moralis, respectively, and their two children brought suit in federal district court challenging the constitutionality of the Program and seeking a permanent injunction against its enforcement. Although both minor plaintiffs have performed and intend to continue performing volunteer work on their own time, they object to being forced to engage in community service as a graduation requirement. The named defendants include the Bethlehem Area School District; Thomas J. Dolusio, in his official capacity as Superintendent of the Bethlehem Area School District; and the nine members of the Board of Directors of the Bethlehem Area School District in their official capacities.
 
 
 14
 The parties filed cross-motions for summary judgment, agreeing that there were no genuine issues as to any material facts. On March 30, 1992, the district court granted defendants' motion and denied plaintiffs' motion. See Steirer v. Bethlehem Area School Dist., 789 F.Supp. 1337 (E.D.Pa.1992). Plaintiffs appealed.[3]
 
 II.
 DISCUSSION
 
 15
 The Bethlehem Area's mandatory community service program is not unique,[4] but we are aware of no federal appellate court decision addressing the constitutionality of such programs in public schools.[5] We exercise plenary review over a district court's grant of summary judgment. Wheeler v. Towanda Area School Dist., 950 F.2d 128, 129 (3d Cir.1991). We turn to plaintiffs' challenges to the mandatory nature of the Program.
 
 A.
 First Amendment
 
 16
 The district court granted summary judgment for defendants on plaintiffs' First Amendment claim on the ground that the community service required by the school district is non-expressive conduct. Plaintiffs contend on appeal that performing mandatory community service is expressive conduct because it forces them to declare a belief in the value of altruism. Proceeding on this premise, plaintiffs argue that heightened scrutiny should be applied and that the school board's reasons for making the program mandatory are not sufficiently compelling to outweigh the infringement of the students' First Amendment right to refrain from expressing such a belief.
 
 
 17
 The freedom of speech protected by the First Amendment,[6] though not absolute, "includes both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). As the Supreme Court has written:
 
 
 18
 If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.
 
 
 19
 West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943); see also Wooley, 430 U.S. at 713, 97 S.Ct. at 1434-35 (unconstitutional to "require an individual to participate in the dissemination of an ideological message by displaying it on his private property [automobile license plate] in a manner and for the express purpose that it be observed and read by the public").
 
 
 20
 To support their position that the required community service is expressive of the school district's ideological viewpoint favoring altruism, plaintiffs point to statements made by individual members of the school board expressing a favorable view of altruism.[7] Plaintiffs argue that the ideology of altruism is a matter of opinion not shared by all, and that "when a student goes out and works for others in his community, it is natural for an observer to assume that the student supports the idea that helping others and serving the community are desirable." Brief of Appellants at 28. Thus, plaintiffs conclude, a student who participates in the community service program is being forced to engage in expressive conduct.
 
 
 21
 We may assume arguendo that the members of the school board who approved the mandatory community service program believed that there was a value in community service, and that this belief may be equated with what plaintiffs choose to call the philosophy of altruism. It does not follow that requiring students to engage in a limited period of community service as an experiential program that is part of the school curriculum is constitutionally invalid. The gamut of courses in a school's curriculum necessarily reflects the value judgments of those responsible for its development, yet requiring students to study course materials, write papers on the subjects, and take the examinations is not prohibited by the First Amendment.
 
 
 22
 The Supreme Court has noted that "[s]tates and local school boards are generally afforded considerable discretion in operating public schools," Edwards v. Aguillard, 82 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987), and it has discouraged judicial intervention in the day-to-day operation of public schools. As the Court stated:
 
 
 23
 By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values.
 
 
 24
 Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (emphasis added) (Arkansas statute prohibiting teaching of a particular doctrine of evolution violates First Amendment). The mere fact that the course content itself reflects a particular ideology does not necessarily trench upon First Amendment proscriptions.
 
 
 25
 On the other hand, we do not accept the suggestion made by defendants at oral argument that once the educational purpose of the Program is established, the Program is ipso facto constitutional. Even "teaching values" must conform to constitutional standards. The constitutional line is crossed when, instead of merely teaching, the educators demand that students express agreement with the educators' values. The Supreme Court explained in Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), that
 
 
 26
 In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligation to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved.
 
 
 27
 Id. at 511, 89 S.Ct. at 739 (emphasis added).
 
 
 28
 The Court applied this principle in Barnette, where it held that requiring students in public school to salute the flag and recite the Pledge of Allegiance, with punishment of expulsion and possible delinquency proceedings for those who refused, was unconstitutional. The Court noted initially that the protection granted by the First Amendment is not limited to verbal utterances but extends as well to expressive conduct. Thus, because the Court viewed saluting the flag in connection with the recital of the Pledge of Allegiance as a "form of utterance," it held that the required salute as well as the recitation was a "compulsion ... to declare a belief" that violated the students' freedom of speech. 319 U.S. at 631, 632, 63 S.Ct. at 1181, 1182. It explained:
 
 
 29
 Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind.
 
 
 30
 Id. at 632, 63 S.Ct. at 1182. In concluding that a compulsory flag salute and pledge "requires affirmation of a belief and an attitude of mind," id. at 633, 63 S.Ct. at 1183, the Court stated:
 
 
 31
 We think the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.
 
 
 32
 Id. at 642, 63 S.Ct. at 1187; see also Lipp v. Morris, 579 F.2d 834, 836 (3d Cir.1978) (per curiam) (requirement that students stand during the Pledge of Allegiance violates the First Amendment).
 
 
 33
 Thus, the question presented by this appeal is whether the performance of community service as a required school program carries with it the same "affirmation of a belief and an attitude of mind" that is a prerequisite for First Amendment protection. Barnette, 319 U.S. at 633, 63 S.Ct. at 1183. Unlike the act of community service, the activity involved in cases holding compelled conduct to be violative of the First Amendment included an obviously expressive element. See, e.g., Riley v. National Federation of the Blind, 487 U.S. 781, 795-801, 108 S.Ct. 2667, 2676-80, 101 L.Ed.2d 669 (1988) (requiring professional fundraisers to disclose to potential donors the percentage of charitable contributions collected in the past twelve months that were actually turned over to charity); Wooley, 430 U.S. at 713-15, 97 S.Ct. at 1434-35 (requiring Jehovah's Witnesses to display state motto "Live Free or Die" on automobile license plates); Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 256-58, 94 S.Ct. 2831, 2838-39, 41 L.Ed.2d 730 (1974) (requiring newspaper to give equal reply space to a political candidate criticized in an editorial). Similarly, a state-required contribution by public school teachers to a labor union's activities was deemed expressive conduct, but only to the extent those union activities involved the expression of political views, the support of political candidates or the advancement of other ideological causes. See Abood v. Detroit Bd. of Educ., 431 U.S. 209, 234-36, 97 S.Ct. 1782, 1799-1800, 52 L.Ed.2d 261 (1977).
 
 
 34
 We find additional guidance for resolution of the question before us in the Court's opinion in Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The issue in that case was whether displaying the American flag with two peace symbols attached to either side of the flag was expressive conduct. In holding that it was, the Court followed the precedent of Barnette, explaining that it had "for decades ... recognized the communicative connotations of the use of flags." Spence, 418 U.S. at 410, 94 S.Ct. at 2730; see also Texas v. Johnson, 491 U.S. 397, 405-06, 109 S.Ct. 2533, 2539-40, 105 L.Ed.2d 342 (1989) (burning American flag in political demonstration is expressive conduct).
 
 
 35
 The Court explained that conduct is protected by the First Amendment only if it is "sufficiently imbued with elements of communication." Spence, 418 U.S. at 409, 94 S.Ct. at 2730. Specifically, the actor must have "[a]n intent to convey a particularized message ... and in the surrounding circumstances the likelihood [must be] great that the message would be understood by those who viewed it." Id. at 410-11, 418 U.S. at 2730. Thus, in deciding whether conduct is expressive, we must look to the nature of the activity in conjunction with the factual context and environment in which it is undertaken.
 
 
 36
 The significance for First Amendment purposes of the viewer's perception is readily apparent in the holdings of the Court that protected expressive conduct includes wearing a black arm band to protest the Vietnam war, Tinker, 393 U.S. at 505-06, 89 S.Ct. at 735-36; burning a draft card to protest the war, United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968); demonstrating on the grounds of a state capitol, Edwards v. South Carolina, 372 U.S. 229, 235-36, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); a civil rights march, Shuttlesworth v. City of Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969); leafletting, Schneider v. Town of Irvington, 308 U.S. 147, 160-61, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939); and labor picketing, Thornhill v. Alabama, 310 U.S. 88, 102-03, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940). See also Brown v. Louisiana, 383 U.S. 131, 141-42, 86 S.Ct. 719, 723-24, 15 L.Ed.2d 637 (1966) (plurality opinion) (sit-in by blacks in a "white-only" library to protest segregation).
 
 
 37
 However, while acknowledging that the First Amendment protects more than "pure" speech, the Supreme Court has also consistently rejected the view that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." See O'Brien, 391 U.S. at 376, 88 S.Ct. at 1678. More recently in City of Dallas v. Stanglin, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), the Court held that dance-hall patrons coming together to engage in recreational dancing were not engaged in "expressive association" protected by the First Amendment. The Court stated,
 
 
 38
 it is possible to find some kernel of expression in almost every activity a person undertakes--for example, walking down the street or meeting one's friends at a shopping mall--but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.
 
 
 39
 Id. at 25, 109 S.Ct. at 1595.
 
 
 40
 The boundaries of expressive conduct have been particularly cabined when the conduct is associated with school curricula. For example, we have held that although teachers have a First Amendment right to advocate the use of particular teaching methods outside of the classroom, this right does not "extend to choosing their own curriculum or classroom management techniques in contravention of school policy or dictates." Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1176 (3d Cir.1990) (no First Amendment right to use "Learnball" in classroom); see also Kirkland v. Northside Indep. School Dist., 890 F.2d 794, 795 (5th Cir.1989) (teacher's use of a supplemental reading list did not "fall within the rubric of constitutionally protected speech"), cert. denied, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); Fowler v. Board of Educ., 819 F.2d 657, 662-63 (6th Cir.) (opinion of Milburn, J.) (teacher's conduct in showing a film was not expressive or communicative where she had shown the film on a noninstructional day, left the room while the film was being shown, and made no attempt to explain to the students a message that could be derived from the film), cert. denied, 484 U.S. 986, 108 S.Ct. 502, 98 L.Ed.2d 501 (1987).
 
 
 41
 Moreover, courts have consistently found that hair and dress codes do not infringe students' First Amendment rights in the absence of any showing that a student's appearance was intended as the symbolic expression of an idea. See, e.g., Bishop v. Colaw, 450 F.2d 1069, 1074 (8th Cir.1971); see also Karr v. Schmidt, 460 F.2d 609, 613 (5th Cir.) (expressing doubt "that the wearing of long hair has sufficient communicative content to entitle it to the protection of the First Amendment"), cert. denied, 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972); New Rider v. Board of Educ., 480 F.2d 693, 698 (10th Cir.) ("wearing of long hair is not akin to pure speech"), cert. denied, 414 U.S. 1097, 94 S.Ct. 733, 38 L.Ed.2d 556 (1973); East Hartford Educ. Ass'n v. Board of Educ., 562 F.2d 838, 842-44 (2d Cir.1977) (public school teachers' dress code does not violate First Amendment).
 
 
 42
 Nonetheless, we do not discount entirely the possibility that a school-imposed requirement of community service could, in some contexts, implicate First Amendment considerations. Arguably, a student who was required to provide community service to an organization whose message conflicted with the student's contrary view could make that claim. Plaintiffs in this case do not make that argument, and the record is to the contrary. The Program does not limit students to providing service to a particular type of community service organization. Students have a multitude of service options which allows them to provide services to organizations with a wide-range of political, religious, and moral views. Activities range from playing in a band to walking a dog for the SPCA. See Steirer, 789 F.Supp. at 1340. The list of approved organizations is extensive and open to additions. Furthermore, students are free to design their own experiential situations.
 
 
 43
 Thus, plaintiffs do not contend that the students are obliged to adopt an organization's objectionable philosophy. Instead they limit their First Amendment challenge to the argument that students must "affirm the philosophy that serving others and helping the community are what life is all about." Brief of Appellants at 25.
 
 
 44
 There is no basis in the record to support the argument that the students who participate in the program are obliged to express their belief, either orally or in writing, in the value of community service. Thus, they are not "confined to the expression of those sentiments that are officially approved." Tinker, 393 U.S. at 511, 89 S.Ct. at 739. To the contrary, as plaintiff Thomas Moralis admitted in his deposition, there is no indication that a student who criticized the Program would not receive a passing grade.[8] Nothing in the record contradicts Moralis' understanding that the students who participate in the Program need not express their agreement with its objectives in order to receiving a passing grade.[9]
 
 
 45
 Finally, plaintiffs have produced no evidence that people in the community who see these students performing community service are likely to perceive their actions as an intended expression of a particularized message of their belief in the value of community service and altruism. We cannot accept plaintiffs' ipse dixit. It is just as likely that students performing community service under the auspices of a highly publicized required school program will be viewed merely as students completing their high school graduation requirements.
 
 
 46
 Because we conclude that the act of performing community service in the context of the Bethlehem Area School District high school graduation requirement is not an expressive act that "directly and sharply implicate[s] constitutional values," Epperson, 393 U.S. at 104, 89 S.Ct. at 270, we think that it is not our role to say that a school system cannot seek to expose its students to community service by requiring them to perform it. To the extent that there is an implicit value judgment underlying the program it is not materially different from that underlying programs that seek to discourage drug use and premature sexual activity, encourage knowledge of civics and abiding in the rule of law, and even encourage exercise and good eating habits. Schools have traditionally undertaken to point students toward values generally shared by the community. In fact, the Supreme Court has stated that public schools have a long history and tradition of teaching values to their students, including those associated with community responsibility. Public schools are important "in the preparation of individuals for participation as citizens, [ ] in the preservation of the values on which our society rests" and for "inculcating fundamental values necessary to the maintenance of a democratic political system." Ambach v. Norwick, 441 U.S. 68, 77, 99 S.Ct. 1589, 1595, 60 L.Ed.2d 49 (1979) (upholding a citizenship requirement for public school teachers); see also Brown v. Board of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (education is "the very foundation of good citizenship").
 
 
 47
 Having decided that the Program does not compel expression protected by the First Amendment, it is unnecessary to consider whether the state has a compelling interest in implementing a mandatory community service graduation requirement. Accordingly, we find that the district court properly granted summary judgment for defendants on plaintiffs' claim that the mandatory community service program violates the First and Fourteenth Amendments.
 
 B.
 Thirteenth Amendment
 
 48
 Plaintiffs' second contention is that a mandatory community service program in a public high school constitutes "involuntary servitude" in violation of the Thirteenth Amendment.[10]
 
 
 49
 The Supreme Court has explained the coverage of "involuntary servitude" as follows:
 
 
 50
 The primary purpose of the [Thirteenth] Amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase "involuntary servitude" was intended to extend "to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results."
 
 
 51
 United States v. Kozminski, 487 U.S. 931, 942, 108 S.Ct. 2751, 2759, 101 L.Ed.2d 788 (1988) (quoting Butler v. Perry, 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916)). As the Supreme Court has acknowledged, it is easier to comprehend the "general spirit" of the phrase "involuntary servitude" than it is to define the exact range of conditions it prohibits. Id. at 942, 108 S.Ct. at 2759.
 
 
 52
 Plaintiffs argue (i) that the program is servitude because the students provide unpaid service to the community for the benefit of others; and (ii) that participation in the program is involuntary because the threat of not receiving a diploma is prima facie coercion. Under the guidance of Kozminski, we believe that it is a mistake to dissect the phrase "involuntary servitude" into two components: instead it is more appropriate to consider whether, taking as a whole the set of conditions existing in the imposition of a mandatory community service program in a public high school, the students providing the services are in a condition of involuntary servitude.
 
 
 53
 In granting summary judgment, the district court placed considerable reliance on Bobilin v. Board of Educ., 403 F.Supp. 1095 (D.Haw.1975), where the court considered whether a state regulation requiring children in public schools to perform cafeteria duty violated the Thirteenth Amendment. The Bobilin court concluded that the mandatory cafeteria duty was not involuntary servitude because "the public, and not private, interest and benefit are being served." Id. at 1104 (footnotes omitted). Unlike the district court, we do not regard the reasoning of Bobilin as "persuasive," Steirer, 789 F.Supp. at 1345, because we are unprepared, at least at this time, to accept the proposition that the Thirteenth Amendment is inapplicable merely because the mandatory service requirement provides a public benefit by saving taxpayers money. We leave that issue for another day. Instead we proceed using a different analysis.
 
 
 54
 The prohibition against involuntary servitude has always barred forced labor through physical coercion. See Kozminski, 487 U.S. at 934, 942, 953, 108 S.Ct. at 2755, 2759, 2765 (upholding a criminal conviction under 18 U.S.C. § 1584 (1988)[11] of three farm operators who used physical coercion, among other things, to keep two mentally retarded men laboring on their dairy farm for no pay). In addition, it may bar forced labor through legal coercion. For example, in Clyatt v. United States, 197 U.S. 207, 215, 218, 25 S.Ct. 429, 429, 431, 49 L.Ed. 726 (1905), the Supreme Court held that peonage, a condition whereby a servant is forced by the threat of legal sanction to work off a debt to a master, constitutes involuntary servitude. Similarly, in United States v. Reynolds, 235 U.S. 133, 146, 150, 35 S.Ct. 86, 89, 90, 59 L.Ed. 162 (1914), the Court found involuntary servitude in a criminal surety system whereby a misdemeanant contracted to work for a surety in exchange for the surety's payment of the fine, subject to criminal penalties should the misdemeanant fail to fulfill the labor contract. In Pollock v. Williams, 322 U.S. 4, 5, 25, 64 S.Ct. 792, 793, 802, 88 L.Ed. 1095 (1944), the Court held that subjecting debtors to prosecution and criminal punishment for failing to perform services for which money had been received in advance violates the prohibition against involuntary servitude. As the Supreme Court has pointed out, the critical factor in every case finding involuntary servitude is that the victim's only choice is between performing the labor on the one hand and physical and/or legal sanctions on the other. See Kozminski, 487 U.S. at 943, 108 S.Ct. at 2760.
 
 
 55
 Significantly, not even every situation in which an individual faces a choice between labor or legal sanction constitutes involuntary servitude. Governments may require individuals to perform certain well-established "civic duties", such as military service and jury duty, and impose legal sanctions for the failure to perform. See Butler, 240 U.S. at 333, 36 S.Ct. at 259. In Butler itself, the Court held that a Florida law requiring every able-bodied male within a certain age range to "work on the roads and bridges of the several counties for six days of not less than ten hours each in each year when summoned," id. at 329, 36 S.Ct. at 258 (quotation omitted), did not amount to involuntary servitude because a compulsory labor requirement, just like jury duty or military service, was a well-established duty owed by individuals to the state. Id. at 333, 36 S.Ct. at 259; see also Selective Draft Law Cases, 245 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918) (holding that draft does not violate Thirteenth Amendment). The Court emphasized that the Thirteenth Amendment was never intended to interfere with the state's power to compel its citizens to fulfill such duties. Butler, 240 U.S. at 333, 36 S.Ct. at 259; see also Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 261, 85 S.Ct. 348, 359, 13 L.Ed.2d 258 (1964) (holding that provision of Civil Rights Act of 1964 prohibiting discrimination in public accommodations did not violate the Thirteenth Amendment because it merely codified common-law innkeeper rule that predated the Thirteenth Amendment, and because the requirements of the Act were not in any way "akin to African slavery" (quoting Butler, 240 U.S. at 332, 36 S.Ct. at 259)).
 
 
 56
 Modern day examples of involuntary servitude have been limited to labor camps, isolated religious sects, or forced confinement. See, e.g., United States v. King, 840 F.2d 1276, 1280 (6th Cir.) (members of the House of Judah, a religious sect, violated 18 U.S.C. § 1584 where they "repeatedly used and threatened to use physical force to make the children [at their camp] perform labor and the children believed they had no viable alternative but to perform such labor"), cert. denied, 488 U.S. 894, 109 S.Ct. 234, 102 L.Ed.2d 224 (1988); United States v. Booker, 655 F.2d 562, 563, 566 (4th Cir.1981) (owners of migrant labor camp held farm workers in involuntary servitude in violation of 18 U.S.C. § 1584 where they forbade them from leaving without paying their debts and enforced the rule by threats of physical harm, actual physical injury, and kidnapping workers who attempted to leave and returning them to the farm); Jobson v. Henne, 355 F.2d 129, 131-32 (2d Cir.1966) (patients in mental institution performing required labor stated claim for violation of Thirteenth Amendment); Downs v. Department of Public Welfare, 368 F.Supp. 454, 465 (E.D.Pa.1973) (same); Santiago v. City of Philadelphia, 435 F.Supp. 136, 156-57 (E.D.Pa.1977) (refusing to dismiss Thirteenth Amendment claim filed by juveniles detained and forced to work at a youth service center).
 
 
 57
 Outside of these contexts, courts have consistently rejected claims that "forced labor" amounted to involuntary servitude. For example, it is not involuntary servitude when the state requires attorneys to provide a fixed number of hours of legal representation without compensation as a condition of practicing law. See United States v. 30.64 Acres of Land, 795 F.2d 796, 800-01 (9th Cir.1986). Similarly, it is not involuntary servitude for the government to collect liquidated damages from a participant in the National Health Service Corps scholarship program who, after accepting the scholarship money and completing his medical degree, declined to perform the required services. See United States v. Redovan, 656 F.Supp. 121, 128-29 (E.D.Pa.1986), aff'd without op., 826 F.2d 1057 (3d Cir.1987). Finally, it is not involuntary servitude to offer prisoners an option of participating in a work-release program, even though the consequence of not working and remaining in jail may be "painful." Watson v. Graves, 909 F.2d 1549, 1552-53 (5th Cir.1990).
 
 
 58
 In each of these situations courts found no compulsion because the individuals had alternatives to performing the labor: a lawyer can choose not to practice law to avoid the mandatory service requirement; a doctor can refuse to provide the contracted-for services and instead pay the damages for breach of the contract; and a prisoner can choose to stay in jail rather than enter the work-release program. The fact that these choices may not be appealing does not make the required labor involuntary servitude. See also Booker, 655 F.2d at 566-67 (not involuntary servitude if "the servant knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad" (quoting United States v. Shackney, 333 F.2d 475, 486 (2d Cir.1964)).
 
 
 59
 Thus, we follow the Supreme Court and other courts of appeals in taking a contextual approach to involuntary servitude by confining the Thirteenth Amendment to those situations that are truly "akin to African slavery." The court in Booker analogized the farm workers at the migrant labor camp to slaves because both "were persons without property and without skills save those in tending the fields. With little education, little money and little hope, they easily fell prey to the tempting offers of powerful and unscrupulous individuals, who would soon assert complete control over their lives." 655 F.2d at 566 (citation and quotation omitted).
 
 
 60
 There is no basis in fact or logic which would support analogizing a mandatory community service program in a public high school to slavery. The record amply supports the defendants' claim that the community service program is primarily designed for the students' own benefit and education, notwithstanding some incidental benefit to the recipients of the services. An educational requirement does not become involuntary servitude merely because one of the stated objectives of the Program is that the students will work "without receiving pay." App. at 268.
 
 
 61
 Accordingly, we hold that the mandatory community service program instituted in the Bethlehem Area School District as a high school graduation requirement does not constitute involuntary servitude prohibited by the Thirteenth Amendment.
 
 III.
 CONCLUSION
 
 62
 For the foregoing reasons, we will affirm the district court's grant of summary judgment for defendants on plaintiffs' claims under the First and Thirteenth Amendments.
 
 
 
 *
 Honorable Donald P. Lay, Senior Judge for the Eighth Circuit sitting by designation
 The Experience Summary Form asks the student the following questions about each community service activity participated in:
 
 
 [1]
 Where did you complete this service?
 How many hours did you serve?
 
 
 [2]
 What were your duties?
 
 
 [3]
 What did you gain from this experience?
 
 
 [4]
 What did you contribute?
 App. at 187.
 
 
 [2]
 It was initially contemplated that the Program would contain a classroom component on decision making, problem solving, and stress management, but this component was not part of the Program as ultimately adopted
 
 
 [3]
 An amicus brief in support of plaintiffs was filed by The Association for Objective Law, "a national organization of lawyers and law students and others formed ... [with the] purpose [of] advanc[ing] Objectivism, the philosophy of Ayn Rand, as the basis of a proper legal system." Amicus Brief for the Association for Objective Law at 1 n. 1. Amici briefs in support of defendants were filed by (i) The Bloomfield Hills School District, a school district in Michigan with a similar mandatory community service program; and (ii) The Carnegie Foundation for the Advancement of Teaching, a public policy center devoted to the improvement of education in the United States; and (iii) The People for the American Way, joined by several other organizations
 
 
 [4]
 See, e.g., Marc Fisher, Serving the Community; A Developing Curriculum Requirement, Wash. Post, Apr. 10, 1988, at R6 (270-hour community service requirement over four years for Banneker High in Washington, D.C.); Roxana Kopetman, Unusual Graduation Requirement; 100 Seniors Set for Community Service Project, L.A. Times, Dec. 22, 1988, at 13 (Long Beach Unified School District high school students must dedicate three school days to community service); Lisa Leff, Maryland Mandates Public Service By Students, Wash. Post, July 30, 1992, at A1 (75-hour community service requirement for high school graduation adopted in Maryland); Students on Compulsory Community Service, Wash. Post, Sept. 5, 1991, at A20 (Georgetown Day High School students have 60-hour community service graduation requirement); Priscilla Van Tassel, Students Do Community Work In School Hours, N.Y. Times, Feb. 16, 1992, § 12NJ, at 1 (state senator has sponsored bill to impose community service graduation requirement; currently students at Princeton High School can choose between community service and career exploration one day a week for one semester)
 
 
 [5]
 Similar, although not identical, issues are raised by mandatory pro bono requirements at state law schools or for the bar. See John C. Scully, Mandatory Pro Bono: An Attack on the Constitution, 19 Hofstra L.Rev. 1229, 1245 (1991); Michael Millemann, Mandatory Pro Bono in Civil Cases: A Partial Answer to the Right Question, 49 Md.L.Rev. 18, 65, 70 (1990)
 
 
 [6]
 The First Amendment, applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I
 
 
 [7]
 See, e.g., App. at 261 ("every individual has a responsibility to other human beings") (statement of defendant Kisslinger); App. at 257 ("as citizens of a democracy [students] have the responsibility to contribute something of their talent toward the welfare of the whole, to return to the community part of all that they have been given by the community") (statement of defendant Thompson); App. at 200 (in testimony defendant Prosser agreed that "human beings have an obligation to provide community service or assistance to other[s]" and that they "should go out of their way to make time to participate in community service")
 
 
 [8]
 In his deposition, plaintiff Thomas Moralis answered the following questions:
 Q. And isn't it true that students will not be asked to adopt or express any particular ideals or beliefs in order to pass?
 A. That is as stated in the curriculum guide.
 Q. And a child does not have to agree with the program in order to pass it, does he?
 A. As far as I know, no.
 Q. And a child does not have to believe in the objectives of the program in order to pass it, does he?
 A. As far as I know, again, at this point, no.
 Q. And a child does not have to say he agrees with the program in order to pass it, does he?
 A. No.
 App. at 171.
 
 
 [9]
 Plaintiffs do not make the argument made by amicus The Association for Objective Law that to pass the Program the student must actually declare a belief in the value of altruistic service
 
 
 [10]
 The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States...." U.S. Const. amend. XIII
 
 
 [11]
 Under this section, anyone who "knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1584 (1988)