Daniel A. GEORGE, Plaintiff,

and

Ernest R. Cooper, Intervenor Plaintiff,

v.

LOCAL UNION NO. 639, INTERNATIONAL BROTHERHOOD of TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN and HELPERS of AMERICA, AFL–CIO, et al., Defendants.

Civ. A. No. 89–0916–LFO.

United States District Court, District of Columbia.

June 8, 1993.

Green, P.C., Washington, DC, for Local Union 639.

## *MEMORANDUM*

OBERDORFER, District Judge.

This suit arises out of a long and bitter dispute between plaintiff, Daniel George, and Local Union No. 639, International Brotherhood of Teamsters (the "Union"), of which he was formerly president. On June 28, 1990, summary judgment was entered for defendants on all but plaintiff's First Amendment claim. Plaintiff then filed two additional amended complaints, alleging Union misconduct subsequent to the filing of the initial complaint. In particular, plaintiff claims that he was improperly issued a withdrawal card from the Union when his unit was terminated from Union representation and that the Union manipulated the rules of its referral hall to deny plaintiff access to Union employment. On August 23, 1991, defendants filed a motion for partial summary judgment on the remaining First Amendment claim from George's original complaint and the new issues raised in the third amended complaint. On September 16, 1991, plaintiff George filed a cross-motion for summary judgment. On November 22, 1991, defendants were granted leave to conduct further discovery on plaintiff's First Amendment claim, and on January 8, 1992, defendants filed a supplemental memorandum in support of their motion for summary judgment. For the reasons stated below, an accompanying Order grants defendants' motion for summary judgment and denies plaintiff's cross-motion for summary judgment.

### I.

In the remaining count of his original complaint, George claims that the Union, and particularly Phillip Feaster, its current president (who unseated George as Union president), systematically denied George the right to speak at Union meetings. Specifically, George contends that Feaster adjourned the February 19, 1989 membership meeting rather than allow him to speak, in violation of the Bylaws of Local 639 and § 101(a)(2) of the Landrum–Griffin Act, 29 U.S.C. § 411(a)(2).

Daniel A. George, pro se.

Jonathan Gans Axelrod, John Robert Mooney, Kathleen A. Murray, and Helen Debra Lerner, Bens, Axelrod, Osborne, Mooney &

Defendants counter that George was out of order, making adjournment of the meeting both necessary and proper. The facts are as follows.

On February 19, 1989, the Union held a meeting for its members employed by Ryder/Jacobs (George's unit). Feaster chaired the meeting from a dais on a stage facing approximately twenty members seated below. Feaster spoke for nearly thirty minutes. When he finished speaking, Feaster recognized George, who was seated in the second row of the hall on the center aisle. George rose and began to speak, apparently challenging what Feaster had just said. At some point during his remarks, George began turning from side to side to address his comments to the membership. The parties dispute whether George actually turned his back on the Chair, but they agree that he did turn from side to side. Feaster advised George several times to direct his comments to the Chair. George responded that his comments were not addressed to Feaster, but to the general membership. After George ignored Feaster's warnings that he would adjourn the meeting if George did not address his comments to the Chair, the meeting was adjourned.

■ Defendants claim that adjournment was necessitated by George's repeated failure to follow the Rules of Order, resulting in the Chair's loss of control over the meeting. George claims that he "turned his body and face to his right and left in order to insure that members to his left and rear could hear what was being said, as well as to accommodate Feaster." Plaintiff's Mem., at 2. George claims that Feaster ordered him to address the Chair only when his remarks became critical of Feaster's leadership. George argues that no Rule of Order requires that a speaker face the Chair and, even if there is such a Rule, it was discriminatorily applied and did not warrant Feaster's adjournment of the meeting.

Title I of the Landrum–Griffin Act protects the rights of union members within a union. In particular, it guarantees the members' right to free speech:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments or opinions; and to express at meetings of the labor organization his views ... upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2); *see also International Organization of Masters, Mates & Pilots v. Brown,* 498 U.S. 466, 111 S.Ct. 880, 112 L.Ed.2d 991 (1991); *Carothers v. Presser,* 818 F.2d 926, 929 (D.C.Cir.1987).

Section 23 of Local 639's Bylaws contain Rules of Order for the conduct of union meetings. The Rules of Order state in relevant part:

Rule 2. The Chairman of the meeting shall enforce these rules and regulations and may direct that members be removed from the meeting for violation of these rules.

\* \* \* \* \* \*

Rule 6. When a member wishes the floor, he shall rise and respectfully address the Chair, and if recognized by the Chair, he shall state his name.

\* \* \* \* \* \*

Rule 8. Every member, while speaking, shall adhere to the question under debate and avoid all invective and indecorous language, but all member[s shall] have the right to express their views, arguments and opinions upon candidates and upon any business properly before the meeting.

Rule 9. No member shall interrupt another member while speaking except for a point of order ... and the Chair shall decide the point without debate.

\* \* \* \* \* \*

Rule 11. If any member shall feel himself aggrieved by a decision of the Chair, he

may appeal from the decision of the Chair to the meeting without debate immediately after the Chair has decided against him.

\* \* \* \* \* \*

Rule 22. A motion to adjourn shall always be in order except: (1) when a member has the floor; (2) when members are voting; (3) when a motion is pending.

\* \* \* \* \* \*

Rule 27. Any question on procedure and debate, not provided for herein, shall be governed by Roberts' [sic] Rules of Order, Revised.

Defendants' Motion, Attachment 3, at 34–37 (Local Union 639 Bylaws).

Section 7 of Robert's Rules of Order provides:

> Speakers must address their remarks to the presiding officer, be courteous in their language and deportment, and avoid personalities, never alluding to the officers or other members by name, where possible to avoid it, nor to the motives of members.

Defendants claim that plaintiff violated this provision of Robert's Rules and Rule 6 of the Union Bylaws when he addressed the membership instead of the presiding officer. For this violation he could have been removed from the meeting pursuant to Rule 2 of the Union Bylaws. Accordingly, it is argued, adjournment was an appropriate alternative and less discriminatory remedy for the violation.

George counters that Rule 6 of the Union Bylaws, which requires that the speaker address the Chair, applies only before a member is recognized, and that Rule 8, which does not require that the speaker address the Chair, governs a member's conduct once he or she has been recognized. In other words, "[o]nce recognized, the Bylaws place no obligation on George to stand in any specific position, face any particular direction or address his remarks to the Chair." Plaintiff's Reply Mem., at 2. Rule 8, however, addresses the content of a member's speech,

not a member's posture or mode of presentation. Since Rule 27 expressly adopts Robert's Rules of Order, Revised, plaintiff's contention cannot stand. Feaster was within his authority in requiring George to address the Chair.[1]

■ George next claims that even if this Rule was reasonably incorporated into the Union Bylaws, it was discriminatorily applied. George argues that the Union had not in the past uniformly required members to face the Chair when speaking. Moreover, plaintiff contends that Feaster would selectively apply Rules of Order to silence individuals who disagreed with him. Plaintiff, however, has not proffered any materially probative evidence that Feaster discriminatorily applied the Rules of Order to silence opposition.

Plaintiff has submitted four affidavits to support his contention. Three of these affidavits are copies of a single form affidavit with the affiant's name and years of Union membership handwritten in the spaces provided. See Plaintiff's Mem., Ex. T–1, T–2 & T–3 (Affidavits of Robert Gross, Danny Jones and James Eader). Paragraph seven of each affidavit recites:

> I have attended meetings where Daniel George would attempt to be recognized by the chair, President Feaster would be chairing the meeting, Feaster would not in some instances allow George to have the floor to speak, but would allow other members to speak, or when he did allow George [sic] to speak, Feaster would rule George out of order, in many instances without any apparent or know [sic] reason to me.

Defendants deposed two of these affiants; the third refused to attend his deposition. See Defendants' Notice of Filing (January 21, 1992) (Proposed Deposition of James Eader). Neither deposed affiant could recall any specific instances, other than the February 19, 1989 meeting, when Feaster prevented George from speaking. See Gross Dep. at 14, 19; Jones Dep. at 17. Despite the fact

---

1. Although there is a dispute as to how far George physically turned away from the Chair, he certainly was not "addressing the presiding officer." Robert's Rules of Order, § 7. In his pleadings George claims that he turned to enable the membership to hear his comments; however, his colloquy with Feaster at the meeting clearly demonstrates that George intended to speak to the membership, not the Chair. See George Dep. at 14, 17.

that Gross had attended every "meeting relative to the negotiations and contract offers that were made between Local 639 and Jacobs and Ryder" prior to the February 19, 1989 meeting, Gross Dep. at 20, he could not remember a single meeting where a speaker did not address the Chair. *See id.* at 19. Gross testified in general terms that Feaster would not allow people who disagreed with him speak, but he did not identify a single incident other than February 19, 1989. Jones testified at his deposition that he attended only "one or two" meetings after Feaster was elected president. Jones Dep. at 8–9. Moreover, he could not remember signing or preparing the affidavit on which his signature appeared. *See id.* at 6–7. In fact,· he had only a vague recollection of the February 19, 1989 meeting. *See id.* at 9–10.[2]

George also produced an affidavit executed by Daniel O'Shea, who is employed by United Parcel Service (UPS). O'Shea stated that because of his work schedule, he did not attend regular Union meetings; however, he did attend meetings held for UPS members only. At those meetings, he claims that the hall was usually equipped with a microphone placed in the center aisle, but that when members did not use the microphone they were permitted to turn from side to side. He also stated that at one meeting two members in front of him stood up, turned around and addressed him directly. Although both speakers turned their back on the Chair, he claims they were not ruled out of order or required to turn and face forward.

O'Shea's affidavit is of little probative value to the facts and circumstances of this case. As O'Shea notes, his knowledge was of UPS meetings and not Ryder/Jacobs meetings. O'Shea's anecdotal recollections of the practices at UPS meetings are not probative of the practices at Ryder/Jacobs meetings or general Union meetings. Moreover, O'Shea does not indicate whether the two individuals who addressed him were recognized by the Chair or whether they were simply engaged in a personal interchange. Therefore, George has not proffered any materially probative evidence in support of his claim of disparate treatment.

 Finally, George claims that even if he was required to address the Chair, Feaster did not follow the appropriate Rules of Order in adjourning the meeting. A motion to adjourn cannot be made when a member has the floor. *See* Rule 22, *supra.* Instead, a point of order must be called, enabling the speaker to appeal the Chair's decision to the membership. *See* Rules 9 & 11, *supra.* However, as discussed above, George did not properly have the floor because of his refusal to address the Chair. A member speaking out of order may be interrupted and the meeting adjourned without a violation of § 101(a)(2) even if the adjournment was procedurally improper. *See Scovile v. Watson,* 338 F.2d 678, 680–81 (7th Cir.1964), *cert. denied,* 380 U.S. 963, 85 S.Ct. 1107, 14 L.Ed.2d 154 (1965); *cf. Finch v. Vernon,* 877 F.2d 1497, 1507 (11th Cir.1989) (adjournment of City Council meeting while plaintiff was speaking because meeting had lost all sem-

2. Jones' deposition testimony was as follows:

Q. Can you tell me what you recall about the February 19th meeting, 1989?

 * * * * * *

A. Well, it was short and sweet, seemed like. [Feaster] called the meeting to order.

 * * * * * *

A. Mr. Feaster called the meeting to order, and stood up, and I don't remember how he said it. But he said due to the last meeting, we didn't get a vote, or something.
We have to get a vote, or we no longer represent. Or he either said it the other way— we no longer represent you because we haven't been voted out.
I just don't remember the way, you know, the way it was put.

Q. Then what happened?
A. Right after that [George] stood up and said, you can't vote on nothing. And all hell broke loose.
Q. Did you stay for the rest of the meeting?
A. I went back in the hallway, and everybody was hollering and screaming. I heard [George] say something. And then Feaster, Mr. Feaster stood up and said, well, this meeting, as far as I am concerned is adjourned.
Q. Were you in the room itself?
A. There is a little hallway, entranceway type thing.

 * * * * * *

Q. You really didn't hear much of what happened after you walked out in the hallway?
A. No.
*Id.* at 9–10.

blance of order did not violate his First Amendment rights).

■ In addition to the problems with plaintiff's argument addressed above, it appears that he did not appeal his challenge to the adjournment of the February 19, 1989 meeting under the Union's internal procedures. Even if the adjournment was defective, therefore, plaintiff has not shown that he properly exhausted his administrative remedies.

■ Finally, plaintiff has failed in any event to proffer competent evidence supporting his allegation of a "campaign to silence [him] and to punish him for his dissident views." Second Amended Complaint ¶ 26. Even assuming plaintiff's version of the February 19, 1989 meeting, the challenged behavior is, at worst, episodic and not systematic. George's claim is that defendants engaged in an entire "pattern of conduct," Plaintiff's Mem., at 5, but the only evidence arguably sufficient to survive defendants' motion is of a single "back-turning" incident. Plaintiff fails to offer material evidence creating a genuine issue of fact on his claim that the Union systematically suppressed or punished him for his speech.

Because Feaster was within the scope of his authority when he adjourned the February 19, 1989 meeting and George has failed to proffer any materially probative evidence in support of his claim that Feaster applied the Rules of Order in a discriminatory manner, defendants' motion for summary judgment with respect to George's First Amendment claim will be granted.[3]

## II.

In his third amended complaint, George largely repeats the allegations of his original complaint. Relitigation of these claims is barred by the June 28, 1990 Memorandum and Order, which granted defendants' motion for summary judgment on these counts. However, George also includes several additional allegations of events occurring after he filed the original complaint. He claims that the Union improperly issued him a withdrawal card and then manipulated the referral hall rules to prevent him from gaining Union employment and thus from regaining active membership in the Union.

At all relevant times, George was employed by Ryder/Jacobs. The Union and Ryder/Jacobs were parties to a series of collective bargaining agreements, the most recent of which expired in 1985. Thereafter, the Union and Ryder/Jacobs negotiated until at least October 1988, when the events giving rise to this litigation occurred.

In response to charges filed by George, the National Labor Relations Board ruled on April 30, 1990, that Ryder/Jacobs lawfully refused to bargain with the Union because it had a good faith belief that the Union no longer represented a majority of the Ryder/Jacobs employees. *See* Defendants' Motion, Attachment 2. Subsequently, on June 26, 1990, the National Labor Relations Board, dismissing a second charge filed by George, reacknowledged this determination. *See id.*, Attachment 12.

On February 14, 1991, the Union advised employees of Ryder/Jacobs that the National Labor Relations Board had found that the company no longer was required to bargain with the Union and that, given the Union's lack of representational rights, it was necessary to issue withdrawal cards six months after the members had become unemployed in the Union's jurisdiction. The letter further stated that to be eligible for a withdrawal card a member had to be current in his

---

3. George also claims that the Union improperly excluded him from a meeting on February 28, 1991. George was initially issued a withdrawal card on February 14, 1991, effective February 1991. George was escorted from the meeting on February 28, 1991, despite the fact that the withdrawal card did not become effective until midnight that night. On March 6, 1991, Feaster sent George a letter notifying George that he was erroneously excluded from the February meeting and inviting him to attend the March meeting. On May 17, 1991, Feaster sent George another letter notifying him that the Union had miscalculated the appropriate date of the withdrawal card and that it should have been effective January 31, 1991. Based on this correction, George was properly excluded from the meeting in February. At any rate, his exclusion from the February meeting does not reflect a deliberate practice of denying George the right to speak at Union meetings.

dues. *See id.*, Attachment 14. Since George was the only member current in his dues, he was sent a withdrawal card with the February 14 letter. *See id.*, Attachment 14. The remaining Ryder/Jacobs employees were suspended.

On February 22, 1991, George returned his withdrawal card to the Union with his dues for March and April. *See id.*, Attachment 17. Both the card and dues were returned to him. *See id.*, Attachment 18. George repeated this exercise on March 8, 1991, March 12, 1991, and again on April 27, 1991. *See id.*, Attachments 22, 24, 33. Each time the Union returned the withdrawal card and the dues to him. *See id.*, Attachment 23, 28. In response to George's final request, Feaster sent George a letter notifying him that his withdrawal card should have been effective earlier, and enclosed a revised withdrawal card. *See id.*, Attachment 1.

Meanwhile, George appealed the decision to issue him a withdrawal card to Joint Council No. 55 on February 21, 1991. At George's request, the Joint Council transferred the appeal to the International Teamsters Union (the "International Union") without a hearing, but the International Union remanded the case with instructions that the Joint Council hold an expeditious hearing. *See id.*, Attachments 16, 20, 26 & 27. The Joint Council conducted a hearing on May 7, 1991, and issued its decision on June 10, 1991. *See id.*, Attachment 15. Based on the panel's determination "that Local Union # 639 did not have a valid or enforceable Labor Agreement with Ryder/Jacobs," it unanimously concluded that the Union "was within [its] rights when [it] issued an Honorable Withdrawal Card to Daniel George on February 14, 1991." *Id.*, Attachment 36.

George appealed the Joint Council's decision to the International Union on June 23, 1991. On November 5, 1991, the International Union affirmed the decision of the Joint Council.

■ George now challenges the Union's decision, as upheld by the International Union, to issue him a withdrawal card. At issue is defendants' interpretation of Article XVII, § 6(a) of the Constitution of the International Brotherhood of Teamsters (the "Constitution"), which states in relevant part:

> When a member *becomes unemployed in the jurisdiction of the Local Union,* he shall be issued an honorable withdrawal card upon his request. If no request is made, an honorable withdrawal card must be issued six (6) months after the month in which the member first becomes unemployed, if he is still unemployed at that time. (Emphasis added.)

The Union maintains that because it lost its right to bargain with George's employer, Ryder/Jacobs, George was no longer employed "in the jurisdiction of the Local Union." George argues that the Union's "jurisdiction" extends to all people working "at the craft" and not only to people working "at the craft" in a union workplace and, therefore, the Union did not have the authority to issue him an involuntary withdrawal card.

■ A union's interpretation of its constitution and rules is entitled to deference, provided that interpretation is fair and reasonable. *Pignotti v. Local # 3 Sheet Metal Workers' Int'l Ass'n,* 477 F.2d 825, 831 (8th Cir.1973), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1974); *English v. Cunningham,* 282 F.2d 848, 850 (D.C.Cir. 1960). In this case the unanimous conclusion of the Joint Council was that the issuance of the withdrawal card to George was proper because the Union "did not have a valid or enforceable Labor Agreement with Ryder/Jacobs." In other words, the Council, and then the International Union, accepted the Union's argument that George ceased to be "employed in the jurisdiction of the Local Union" when his employer no longer had a contract with the Union.

The parties' dispute presents a difficult issue on which there is scant guidance in legal authority. Article II, § 1(a) of the Constitution defines "jurisdiction" by listing the types of employment capable of being organized by the Union, without reference to the employer or the union status of the workplace. Section 2(a) of that same Article broadly states that "[a]ny person shall be eligible for membership in th[e] organiza-

tion," without significant restriction.[4] Therefore, there is no language explicitly including the concept of Union representation in the meaning of the term "jurisdiction."

Nevertheless, the Union's interpretation makes some logical sense. Once an employee ceases working for a company under contract with the Union, the Union can no longer represent the employee regarding the terms and conditions of employment. Although the employee may remain in the Local Union's geographical area and may continue to work "at the craft," the employee is no longer under the Union's protective umbrella, and in this sense is no longer employed within its "jurisdiction." Put another way, the Union may have "personal jurisdiction" but not "subject matter jurisdiction" over the employment relationship.

The Union's interpretation finds some indirect support in the language of some cases. *See Bright v. Schlinke*, 119 L.R.R.M. 3463, 3465 (E.D.Tex.1984) (withdrawal card relieves former employees "from the burden of union dues when they had little or no income and *when the union could do nothing to save their jobs*") (emphasis added); *Schmutz Foundry & Machine Co.*, 251 N.L.R.B. 1494, 1500 (1980), *enf'd*, 678 F.2d 657 (6th Cir.1982) (an inactive member on withdrawal card may be restored to active status without payment of an initiation fee if he "is later employed *on a job where the Union is the collective bargaining agent*") (emphasis added). There is also some support for the Union's position in the practice among Teamsters local unions of issuing withdrawal cards when an employment relationship is not covered by a labor contract. *See, e.g., Phillips v. Kennedy*, 542 F.2d 52, 55 n. 8 (8th Cir.1976); *Kehm v. Central Pa. Teamsters Pension Fund*, C.A. 85–2241, 1986 WL 7644 (E.D.Pa.1986) (Defendants' Motion, Attachment 45); *Harley–Davidson Transportation Co.*, 273 N.L.R.B. 1531, 1535 (1985); *Sinclair & Valentine Co.*, 238 N.L.R.B. 754, 756 (1978). These cases may be of limited value here, however, because they all appear to have involved the issuance of *voluntary* withdrawal cards.

Although there is no directly applicable authority supporting the Union's interpretation of Article XVIII, there also appears to be none rejecting it. Plaintiff's strongest argument is that the plain language of Article XVIII requires nothing more than employment "at the craft" for full membership status. However, there is no convincing reason why the term "jurisdiction" could not encompass the deeper meaning (analogous to subject matter jurisdiction) suggested by defendants. The Joint Council and the International Union adopted such an interpretation. The cases do indicate that the purpose of a withdrawal card is to protect employees from the burden of union dues. *See, e.g., Bright*, 119 L.R.R.M. at 3465. On the other hand, there apparently is no case suggesting that the withdrawal card cannot have a broader function, as urged by the Union.

In light of the lack of clear authority on the question, the reasonableness of the Union's interpretation, and the obligation to defer to that reasonable interpretation, it will be adopted here. Because his employer was no longer under contract with the Union, George was not employed "in the jurisdiction of the Local Union." His withdrawal card therefore was properly issued pursuant to Article XVIII, § 6(a) of the Constitution.

■ Plaintiff's additional arguments in connection with the Union's issuance of the withdrawal card are without merit. George fails to establish that he was entitled to a hearing before issuance of the withdrawal card. Hearings are unnecessary where, as here, a Union makes only a ministerial or mathematical decision. *Galke v. Duffy*, 645 F.2d 118, 120 (2d Cir.1981). Plaintiff's challenge to the Joint Council proceeding is also unpersuasive. Plaintiff did not raise the issue of bias before the Council and therefore has waived the argument. In any event, plaintiff's claim of bias is utterly unsupported.

Finally, plaintiff has not established his entitlement to the discovery he requested during the internal Union appeals, nor has he

---

4. The first sentence of § 2(a) states in its entirety: "Any person shall be eligible to membership in this organization upon compliance with the requirements of this Constitution and the rulings of the General Executive Board."

shown that such material was relevant, that it could lead to relevant material or that it would have affected the outcome of the proceedings.

Accordingly, the accompanying Order dismisses plaintiff's withdrawal card claim pursuant to Fed.R.Civ.P. 56.

### III.

George's remaining claim is that the Union manipulated the rules of the referral hall to prevent George from regaining active Union membership status.[5] George's claim cannot withstand defendants' motion for summary judgment.

 A union "may not apply arbitrary or invidious criteria in referring employees to jobs." *International Union of Operating Eng'rs v. NLRB,* 701 F.2d 504 (5th Cir.1983). Plaintiff has failed to proffer material evidence in support of such a claim. The record reveals that George began seeking referrals on February 27, 1991. Feaster then determined, and confirmed, that George was not working at Ryder/Jacobs because of an injury. On March 11, 1991, Feaster wrote that it would be irresponsible and imprudent for the Union to refer George for work while he was on worker's compensation status. George did not submit evidence of his medical availability. Nevertheless, in late March the Union referred George for employment, and George worked pursuant to that referral for a number of days in March and April.

George fails to present any evidence, or even to allege, that the Union ever acted on Feaster's statement that George should not be referred because of a known medical problem. Moreover, a decision on the Union's part to refrain from referring an employee with a medical problem would not have been arbitrary or invidious. Indeed, a referral of an employee in the face of reasonable notice of that employee's disability could potentially raise the specter of a breach of the Union's obligations. *Cf. Riley v. Tokola*

*Offshore, Inc.,* 626 F.Supp. 616, 619–20 (C.D.Cal.1985).

George also fails to show that the Union lacked credible evidence of George's medical disqualification from work, and George's failure to respond to discovery requests on the matter further undermines his position. Finally, George does not proffer any evidence showing a genuine issue as to any arbitrary or improper action taken by the Union in connection with use of a "preferred" list of employees.

Accordingly, the accompanying Order grants defendants' motion for summary judgment on the remaining counts.

---

**5.** The Union operates a "referral hall" so that members and others can obtain work with unionized employers. One seeking work must call the referral hall between 5:00 a.m. and 9:00 a.m. and leave his name, telephone number, social security number and type of work sought. The Union creates a new referral list each day.