United States Court of Appeals,

Fifth Circuit.

No. 96-30219.

Philip CABROL, Plaintiff-Appellant,

Gloria Cabrol, Plaintiff,

v.

TOWN OF YOUNGSVILLE;  Lucas Denais, Mayor, Defendants-Appellees.

Feb. 24, 1997.

Appeal from the United States District Court for the Western District of Louisiana.

Before SMITH and PARKER, Circuit Judges, and JUSTICE,[*] District Judge.

PARKER, Circuit Judge:

This case arises from the sights, smells and early morning sounds emanating from the yard of Philip Cabrol ("Cabrol"), who appeals from an order granting summary judgment to the town of Youngsville, Louisiana ("Youngsville"), and the mayor of the town, Lucas Denais ("the mayor") in his action under 42 U.S.C. § 1983 for alleged violations of his rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment.  An at-will employee of Youngsville, Cabrol brought this action after being terminated from his position after refusing the mayor's request to relocate the chickens inhabiting Cabrol's residence's yard.  Cabrol contends on appeal that (1) the district court improperly granted summary judgment on Cabrol's due process claim because Cabrol had a property interest in his employment, the deprivation of which required due process protections; (2) that summary judgment was improperly granted on his second due process claim because stigmatizing allegations were made in connection with his termination that deprived him of a liberty interest without due process;  (3) that summary judgment was improperly granted on his claim that he was retaliatorily discharged for exercising his right to speech under the First Amendment;  (4) that the district court improperly found that the mayor was entitled to qualified immunity;  and (5) that

[*]District Judge of the Eastern District of Texas, sitting by designation.

the district court erred in dismissing Cabrol's supplemental state law claims.  For the following reasons, we affirm.

## I. *FACTUAL AND PROCEDURAL HISTORY*

Viewing the summary judgment record in a light most favorable to the nonmovant, Cabrol, the facts are as follows.  Cabrol was hired by Youngsville as a part-time water meter reader in December 1986 following a unanimously supported motion of the town council.  In November of 1987, by vote of the town council, a part-time position of "mayor's assistant" was created and, following a vote of the town council, Cabrol was hired for this job.  In addition to reading meters, Cabrol's duties in this position included maintenance of city utilities and streets, and customer service related to utilities and streets.

Cabrol raises "fighting chickens"[1] at his residence in Youngsville.  By the fall of 1994, the mayor had received complaints regarding the noise and smell generated by Cabrol's and others' chickens.  The record indicates that at least one council member had received similar complaints.

In the fall of 1994, the mayor sponsored a proposed amendment to Youngsville's nuisance ordinance.  The amendment apparently added "disagreeable or obnoxious odors and stenches" and "unnecessary or unauthorized noises ... including animal noises" to the nuisance ordinance's definition of nuisance.  One member of the town council expressed concern about the amendment's ramifications for animal ownership in Youngsville when it was discussed at the October 1994 council meeting, and the amendment was tabled.

Cabrol testified that he was opposed to the amendment, and spoke to several council members, other chicken fighters and some Youngsville residents while at the post office regarding the issue.  Cabrol understood that the amendment would be discussed at the November 10, 1994

---

[1]Cabrol refers to the inhabitants of his yard as "fighting chickens."  Fighting chickens are raised for "cockfighting."  See *Blood Sport,* The Tucson Citizen, Mar. 20, 1996, at A1, 1996 WL 8173922, for one description of the sport.

town council meeting.[2] Cabrol's position with the town involved attending the town council meetings. He attended the meeting but did not speak. The amendment was not reintroduced at the November meeting; in fact, it was never reintroduced or adopted.

On November 16, 1994, the mayor sent Cabrol a letter informing him that his employment with the town would be terminated if he did not rid his yard of the chickens by November 30, 1994. This letter apparently followed some conversation on the topic. The mayor explained that he had received "numerous complaints" about Cabrol's chickens: "The complaints about your chickens range from stinky, unsightly to noisy." Cabrol did not remove the chickens from his yard.

Effective November 30, 1994, the mayor terminated Cabrol. Cabrol subsequently filed this action in district court under 42 U.S.C. § 1983, claiming that Youngsville and the mayor deprived him of liberty and property interests without due process as guaranteed by the Fourteenth Amendment and retaliatorily discharged him for exercising his First Amendment right to expression. He also included supplementary state law claims based on Louisiana's Constitution and statutory law that parallel the 42 U.S.C. § 1983 claims. The district court granted summary judgment for the defendants and dismissed the state law claims without prejudice. It issued no written opinion but its statements at the summary judgment hearing indicate that it found that Cabrol had no property interest in his job and, as an at-will employee, could be terminated for any reason.

Cabrol appeals the district court's judgment to this court, arguing the following: (1) that his termination failed to comply with the Due Process Clause of the Fourteenth Amendment in that he had a property interest in his continued employment of which he was deprived without due process; (2) that stigmatizing allegations were made in connection with his termination implicating a liberty interest of which he was deprived without due pro from his at-will position was his verbal and symbolic opposition to the proposed amendment to Youngsville's nuisance ordinance in violation of his right to expression under the First Amendment; (4) that the district court erred in finding the

___

[2]No meeting agenda reflecting the scheduling of the amendment for the council discussion is in the record. Agendas for other months' meetings are in the record.

3

mayor entitled to qualified immunity; and (5) that the district court erred in dismissing the supplementary state law claims.

## II. *DISCUSSION*

We review orders granting summary judgment *de novo,* applying the same standards as the district court. *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When reviewing an order granting summary judgment, we are not limited to the district court's conclusions but can affirm a district court's judgment on any grounds supported by the summary judgment record. *Sojourner T. v. Edwards,* 974 F.2d 27, 30 (5th Cir.1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993).

In reviewing 42 U.S.C. § 1983 actions where qualified immunity is asserted, our first inquiry concerns whether a constitutional violation occurred. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Thus, we turn to a review of the three constitutional claims, after which we address Cabrol's additional contentions, which include the issue of the mayor's entitlement to qualified immunity.

### A. *Deprivation of a Property Interest without Due Process*

Cabrol contends that his due process rights were violated by the mayor's termination of him, rather than such occurring following a vote of the town council. Cabrol argues that even though no written contract vested him with a property interest, the town council practice of voting when hiring issues are presented to the council created an understanding that a town council vote would precede any dismissal. He contends that this understanding functioned as an implicit contract regarding termination procedure that acted to secure a property interest.

The Fourteenth Amendment's Due Process Clause does not create a property interest in government employment. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Blackburn v. City of Marshall,* 42 F.3d 925, 936 (5th Cir.1995). Rather, property interests stem from independent sources. *Id.* A government employee

4

may possess such an interest by operation of contract or state law, *see Board of Regents of State Colleges,* 408 U.S. at 577, 92 S.Ct. at 2709; *Cleveland Board of Ed. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985), or perhaps a policy, *see Schaper v. City of Huntsville,* 813 F.2d 709, 713 (5th Cir.1987) (policy that "just cause" required for dismissal). Accordingly, in order to advance a due process claim in connection with his termination, Cabrol must point to some state or local law, contract or understanding that creates a property interest in his continued employment. Absent a property interest, there is nothing subject to due process protections and our inquiry ends.

To determine if Cabrol had a property interest in his employment we look to Louisiana state and local law. *Schaper,* 813 F.2d at 713. Absent a contractual agreement for employment for a specified term or a legislative or regulatory restraint on a public entity's termination authority, Louisiana law does not establish a riy v. St. Landry Parish Police Jury, 802 F.2d 822, 825-26 (5th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987); *Overman v. Fluor Constructors, Inc.,* 797 F.2d 217, 218 (5th Cir.1986); *Cowart v. Lee,* 626 So.2d 93 (La.Ct.App.1993); *Jackson v. East Baton Rouge Parish Indigent Defender's Board,* 353 So.2d 344, 345 (La.Ct.App.1977) ("[T]here is no case holding that a specific employment position is a property right of that employee, absent a showing of any contractual agreement or legislative act or rule."). Cabrol did not have an employment contract and no state law or regulation assists him.

Rather than creating a property interest, Louisiana law delegates to mayors the authority to fire an employee holding a position such as Cabrol's as long as he is not a civil servant and ordinances do not provide otherwise. Louisiana's Lawrason Act delegates the following powers to mayors:

> Subject to applicable state law, ordinance, and civil service rules and regulations, to appoint and remove municipal employees, other than employees of a police department with an elected chief of police. However, appointment or removal of a nonelected chief of police, the municipal clerk, the municipal attorney, or any department head, shall be subject to approval by the board of aldermen, except that in the case of a tie vote, the recommendation of the mayor shall prevail.

La.Rev.Stat.Ann. § 33:404(A)(3). Cabrol was not a civil servant and no ordinances are alleged. Thus, state law is of no assistance to Cabrol in the establishment of a property interest.

5

Lacking either an employment contract or a statutory provision creating a property interest in his position, Cabrol relies on the local pract ice of the town council voting when presented with hiring questions. He does not allege that Youngsville has any ordinance or charter provision regarding the town council's involvement in the hiring or firing of town employees. The sole custom alleged by Cabrol is not that the council always votes on firings, but that the council regularly uses *Robert's Rules of Order* when hiring issues are introduced at council meetings. Cabrol argues that the town council's practice of voting when present ed with hiring issues constitutes a policy encompassing employment termination that stands as an implicit contract, and that such an implicit contract provides him with a property interest.

*Robert's Rules of Order* is a leading source of parliamentary law in the United States, first published in this country in 1876. *Cleary v. News Corp.,* 30 F.3d 1255, 1257 (9th Cir.1994). Unless adopted by some type of legislative enactment, we view *Robert's Rules of Order* as purely parliamentary procedure governing the operation of the town council upon convening, *see Mapp v. Lawaetz,* 882 F.2d 49, 52 n. 1 (3rd Cir.1989), which we examine only in the context of the council's conduct's compliance with statutory and constitutional requirements, *see Brown v. Hansen,* 973 F.2d 1118, 1122 (3rd Cir.1992); *George v. Local Union No. 639,* 825 F.Supp. 328, 333 (D.D.C.1993). There is no allegation or evidence in the record that the council adopted by enactment any part of *Robert's Rules of Order* either generally for purposes of council business, or specifically in relation to any personnel procedures. Even if they had, the council's parliamentary rules would not operate to create a property interest. *See Henderson v. Sotelo,* 761 F.2d 1093, 1097-98 (5th Cir.1985) (violation of city charter's procedure requiring "advice and consent" of city commissioners prior to termination does not create a property interest that otherwise did not exist).

Even viewing the use of *Robert's Rules of Order* by the town council in addressing hiring issues presented to the council as an understanding of some sort as to termination procedures, Cabrol's argument similarly fails since " "property' cannot be defined by the procedures provided for its deprivation," *Loudermill,* 470 U.S. at 541, 105 S.Ct. at 1493, irrespective of source of that

6

procedure, be it city charter, ordinance, or policy.

Since Cabrol cannot establish a property interest even with the most indulgent reading of his evidence, his argument on this issue fails.

B. *Deprivation of Liberty Interest without Due Process*

The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects an individual's liberty interest which is viewed as including an individual's freedom to work and earn a living and to establish a home and position in one's community. *Board of Regents of State Colleges,* 408 U.S. at 572, 92 S.Ct. at 2706-07. Cabrol maintains that the town violated his due process rights by terminating his employment in a stigmatizing manner, thus depriving him of a liberty interest. Cabrol points to the mayor's rendition in his letter of complaints about Cabrol's chickens as "ranging from stinky, unsightly to noisy." The defendants assert that Cabrol suffered no such deprivation.

Due process protections are triggered only upon deprivation of "life, liberty, or property," *see* U.S. Const. Amend. XIV, § 1, and thus our initial inquiry in reviewing Cabrol's claim concerns whether he was deprived of a liberty interest. *See Cuellar v. Tex. Employment Comm'n,* 825 F.2d 930, 934 (5th Cir.1987). A public employee is deprived of a protected liberty interest *either* if terminated for a reason which was (i) false, (ii) publicized, and (iii) stigmatizing to his standing or reputation in his community *or* if terminated for a reason that was (i) false and (ii) had a stigmatizing effect such that (iii) he was denied other employment opportunities as a result. *Board of Regents of State Colleges,* 408 U.S. 564, 92 S.Ct. 2701; *Codd v. Velger,* 429 U.S. 624, 627, 628, 97 S.Ct. 882, 883, 884, 51 L.Ed.2d 92 (1977) (*per curiam* ); *Moore v. Miss. Valley State Univ.,* 871 F.2d 545, 549 (5th Cir.1989); *Wells v. Hico I.S.D.,* 736 F.2d 243, 256-57 (5th Cir.1984), *cert. dismissed,* 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985). Cabrol does not argue that his termination impaired his employment opportunities, but contends that the basis of his termination stigmatized him in his community. "[I]n a small, close knit community such as Youngsville, allegations of one's owning smelly, noisy, unsightly chickens in connection with firing from one's job constitutes blackening of one's name."

7

We affirm the district court's grant of summary judgment on this claim for two reasons. A necessary prerequisite to finding the deprivation of a liberty interest in this scenario is that the publicized basis of the termination was false. *Blackburn v. City of Marshall,* 42 F.3d 925, 936 (5th Cir.1995). A stigma depriving a person of a liberty interest does so in part because it is a false impression broadcast to either one's personal or professional communities. *See Codd,* 429 U.S. 624, 97 S.Ct. 882; *Ersek v. Township of Springfield,* 102 F.3d 79 (3rd Cir.1996) (harm must be caused by falsity of statements and facts stated were true); *Fraternal Order of Police v. Tucker,* 868 F.2d 74, 82 (3rd Cir.1989) (no liberty interest implicated when press release about discharge of police officers was not misleading). While Cabrol invokes the term "false" in his brief, he does not indicate what aspect of the basis of his termination is false. He does not contend that he did not raise chickens in his yard, he does not contend that the mayor did not receive complaints, and he does not contend that his chickens are not "stinky," "unsightly" or "noisy." Cabrol does not argue that a dissemination of falsehoods or untruths about the circumstances surrounding his termination stigmatized him, but rather that the true circumstance of losing his job in connection with his refusal to relocate his chickens caused him some embarrassment. Such is insufficient.

The second reason supporting our affirming the district court on tnot impose a stigma on Cabrol of the nature that works a deprivation of a liberty interest. While it is generally understood that the loss of a job can be stigmatizing in itself, the law requires more to find a liberty deprivation. *Wells,* 736 F.2d at 258. Terminations have imposed a stigma depriving plaintiffs of a liberty interest where the allegations supporting a termination involved dishonesty or immorality, *see Board of Regents,* 408 U.S. at 573, 92 S.Ct. at 2707; *Blackburn,* 42 F.3d at 936 n. 9, and alcoholism, disloyalty, or subversive acts, *see Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Lashbrook v. Oerkfitz,* 65 F.3d 1339, 1348 (7th Cir.1995). Charges supporting termination that have not imposed a stigma sufficient to implicate a constitutionally protected liberty interest include participation in an illegal strike, *Burnly v. Thompson,* 524 F.2d 1233, 1240 (5th Cir.1975), and "incompetence and outside activities," *Robertson v. Rogers,* 679 F.2d 1090, 1092 (4th

Cir.1982). Like these latter examples, the publicized basis of Cabrol's termination did not involve "any charge against him that might seriously damage his standing and association in the community," or put Cabrol's "good name, reputation, honor, or integrity at stake." *Board of Regents of State Colleges,* 408 U.S. at 573, 92 S.Ct. at 2707 (citations omitted). Raising chickens for cockfighting purposes is not illegal and cockfighting itself is not illegal in Louisiana. Far from serving as a stigma, Cabrol continues to embrace his avocation in a public fashion. He associates with an affiliation of chicken fighters and continues to raise the chickens in his yard. At the same time that Cabrol asserts that the public dissemination of the reason for his firing was stigmatizing, he testified that many people in Youngsville have indicated their support of his decision to retain the chickens in his yard. There is no evidence of a stigma of the magnituourteenth Amendment did not require any procedural safeguards in connection with Cabrol's discharge, and his argument on this issue fails.

## C. *First Amendment Claim*

Cabrol alleges that he was discharged in retaliation for exercising his First Amendment right to free speech and political expression. Specifically, he maintains that the mayor terminated his employment because he actively opposed the ordinance amendment sponsored by the mayor. The defendants contend that Cabrol was not fired for any type of opposition to the ordinance, but rather because he did not rid his yard of the chickens as requested by the mayor.

An at-will public employee may not be discharged for exercising his First Amendment right to freedom of expression. *Thompson v. City of Starkville,* 901 F.2d 456, 460 (5th Cir.1990). To prove a retaliation claim cognizable under the First Amendment, Cabrol must (1) show that his speech was constitutionally protected, i.e., that it involved a matter of public concern; (2) that his interest in commenting on the matters of public concern outweighs the public employer's interest in promoting efficiency; and (3) that his speech was a motivating or substantial factor in the termination decision. *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995).

### 1. *Cabrol's Conversations*

Cabrol argues that he spoke with some council members about the ordinance amendment,

9

and also that he spoke with some Youngsville residents at the post office as well as fellow chicken fighters about the issue. These are the sole conversations alleged by Cabrol as the basis of his claim. Accepting Cabrol's testimony as true for summary judgment purposes, we skip ahead in our inquiry to the third element, the causation issue. Cabrol submitted no evidence regarding how the mayor, the person who terminated him, was made aware of any of these conversations. By failing to do so, Cabrol fails to address an essential element of his claim. In the absence of evidence that such conversations made their way back to the mayor, this First Amendment claim fails. *See Fowler,* 68 F.3d at 127 (no genuine issue of material fact raised concerning motivation behind discharge where no evidence that defendant knew of plaintiff's speech). When the nonmovant fails to make a sufficient showing on an essential element of his claim, the moving party is entitled to summary judgment "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## 2. *Cabrol's Expressive Conduct*

Cabrol also advances a First Amendment claim based on retaliation for symbolic speech, citing his conduct in not getting rid of his chickens following the mayor's request and his attendance of the council meeting in which he understood that the proposed ordinance amendment would be discussed.

In some situations, nonverbal conduct can constitute protected "speech" for purposes of the First Amendment. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 14-23, 96 S.Ct. 612, 632-36, 46 L.Ed.2d 659 (1976) (campaign expenditures are political expression); *Spence v. Washington,* 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (taping black peace symbols to United States flag in 1970 expressed political criticisms that viewers understood); *Tinker v. Des Moines Indep. Community School District,* 393 U.S. 503, 505, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (wearing armbands to protest Vietnam War is protected "symbolic act").

The question of the protected status of speech is one of law, and as such, we review the issue *de novo. Stewart v. Parish of Jefferson,* 951 F.2d 681, 683 (5th Cir.1992); *Kirkland v. Northside*

10

*I.S.D.,* 890 F.2d 794, 797 (5th Cir.1989), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). In considering Cabrol's conduct, we keep in mind the Supreme Court's rejection in *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), of "the view that an apparently limitless variety of conduct can be labeled "speech' whenever the person engaging in conduct intends thereby to express an idea." *See also City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989) ("possible to find kernel of expression in almost every activity a person undertakes ... but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."); *New Orleans S.S. Ass'n v. General Longshore Workers,* 626 F.2d 455, 462 n. 5 (5th Cir.1980) (noting that all communication involves conduct), *aff'd sub nom. Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). For activities to constitute expressive conduct and fall within the scope of the First Amendment, they must be "sufficiently imbued with elements of communication." *Spence,* 418 U.S. at 409, 94 S.Ct. at 2730. In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we ask whether an intent to convey a particularized message was present and whether the likelihood was great that the message would be understood by those who viewed it. *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989); *United States v. Hayward,* 6 F.3d 1241, 1249 (7th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994). In considering such, we look to the appellant's activity, combined with the factual context and environment in which it was undertaken. *Spence,* 418 U.S. at 409-10, 94 S.Ct. at 2729-30; *Steirer v. Bethlehem Area School District,* 987 F.2d 989, 995 (3rd Cir.), *cert. denied,* 510 U.S. 824, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993).

The nature of Cabrol's activities, combined with the factual context and environment in which undertaken, do not amount to an expressive act for purposes of the First Amendment. *Cf. Buckley,* 424 U.S. 1, 96 S.Ct. 612; *Spence,* 418 U.S. 405, 94 S.Ct. 2727; *Tinker,* 393 U.S. 503, 89 S.Ct. 733. In order for a message to be delivered by conduct, it must, in context, be reasonably apprehended by

11

viewers. *See Spence,* 418 U.S. 405, 94 S.Ct. 2727; *Tinker,* 393 U.S. 503, 89 S.Ct. 733; *Steirer,* 987 F.2d at 995. There was no likelihood, *see Johnson,* 491 U.S. at 404, 109 S.Ct. at 2539-40, that Cabrol's activity, combined with its context and environment, communicated a message to viewers. Cabrol was not doing anything that he had not been doing previously. His continued maintenance of the chickens in his yard did not occur in the context of, for example, any accompanying conduct or speech or symbol, and there is no allegation that either the proposed amendment or the mayor's request had entered the local public consciousness. There was no context that would allow the continued residence of the chickens in Cabrol's yard to resonate a message to viewers that Cabrol opposed the proposed ordinance amendment. *Compare Spence,* 418 U.S. 405, 94 S.Ct. 2727 (current events and timing allowed message to be communicated). With no likelihood that viewers would perceive any message, there is no expressive conduct to be protected by the First Amendment. *See Steirer,* 987 F.2d at 997 (no evidence that people in community who saw students performing community service were likely to perceive actions as expression of belief in value of community service or altruism).

The second instance of conduct on which Cabrol relies, his attendance at a council meeting at which he understood that the ordinance amendment was to be discussed, also fails to support his claim. He did not speak at the meeting and his attendance at council meetings was part of his job performance. As such, his attendance is not protected expressive conduct. General job performance, lacking assertion of specific speech activity, fails to resemble the expressive conduct at stake in cases such as *Tinker, Spence,* and *Valeo. Guillory v. St. Landry Parish Police Jury,* 802 F.2d 822, 826 (5th Cir.1986).

### D. *Qualified Immunity*

In 42 U.S.C. § 1983 actions in which qualified immunity is asserted, we, as previously noted, first determine if a constitutional violation has occurred. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Because we find no constitutional violations, as explained in our discussion, we need not address the qualified immunity issue.

12

E. *State Law Claims*

Regarding the district court's dismissal of Cabrol's state law claims, we review such a decision for an abuse of discretion. *Laird v. Board of Trustees of Inst'ns of Higher Learning of Miss.,* 721 F.2d 529, 534 (5th Cir.1983). The district court has the discretionary power to adjudicate supplemental state law claims after dismissing the federal claims that originally served as the basis of its jurisdiction. *Cinel v. Connick,* 15 F.3d 1338, 1344 (5th Cir.) (citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)), *cert. denied,* --- U.S. ----, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). After reviewing the factors involved in the exercise of the district court's discretion, *see Id.; Laird,* 721 F.2d at 534 (citing *Gibbs,* 383 U.S. 715, 86 S.Ct. 1130), we affirm the district court's decision. Cabrol failed to provide any reason that his state law claims should be reinstated and remanded. After reviewing the customary considerations, e.g., judicial economy, convenience, fairness and comity, *see Cinel,* 15 F.3d at 1344, we find no support for the suggestion that the district court abused its discretion in dismissing the state law claims. *See Laird,* 721 F.2d at 534-35.

## III. *CONCLUSION*

For the foregoing reasons, we AFFIRM the district court's order granting summary judgment to the defendants and dismissing the supplemental state law claims.

JUSTICE, District Judge, dissenting:

An at-will employee has very few protections against being discharged from employment, whether working in the private or public sector. One crucial difference between a private and public employee, however, lies in the fact that the United States Constitution prohibits the government from discharging a public employee for exercising his First Amendment right to freedom of expression. Specifically, public employees have the right to speak out on matters of public concern and cannot be retaliated against for such speech, if the employee's interest in commenting on matters of public concern outweighs the public employer's interest in promoting efficiency. *See Kinsey v. Salado Indep. School Dist.,* 950 F.2d 988 (5th Cir.) (en banc), *cert. denied,* 504 U.S. 941, 112 S.Ct. 2275,

13

119 L.Ed.2d 201 (1992). Upon becoming a public employee, an individual such as Philip Cabrol is thus not forced to sacrifice one of the greatest rights our Constitution affords the people of this nation—the right to participate freely in debates on public issues.

The majority concedes the First Amendment right of public employees such as Cabrol to speak out on issues of public concern, in this instance, "fighting chickens." But, the majority finds that Cabrol failed to make a sufficient showing that his comments on this public issue were, in any manner, made known to the mayor, who discharged Cabrol from his employment by the Town. This failure, the majority holds, obviates a finding that Cabrol's speech was a motivating or substantial factor in the mayor's decision to dismiss Cabrol. Hence, the majority has affirmed the district court's order granting summary judgment against Cabrol on this issue. I believe, however, that the evidence in the record shows otherwise, and for this reason, I dissent from the majority's resolution of Cabrol's First Amendment claims. I concur in the remainder of the majority's opinion.

The Town of Youngsville is a small community in Louisiana with wellty's opinion, in the fall of 1994, the mayor sponsored a proposed amendment to Youngsville's nuisance ordinance which targeted Cabrol's and other citizens' fighting chickens by outlawing "disagreeable or obnoxious odors and stenches" in addition to "unnecessary or unauthorized noises ... including animal noises." Cabrol, apparently an avid chicken fighter, believed that the proposed ordinance constituted foul play, and, rather than brooding over the proposal, vocalized his opposition to the amendment in the community. He spoke to several council members, others raising fighting chickens in the community, and various Youngsville residents about his opposition to the amendment. Several members of the town council rallied behind Cabrol, and told him that he should be able to keep his chickens. Indeed, at the meeting of the Town Council that considered the matter, opposition to the proposed ordinance amendment was so strong that it was tabled and never brought up for a vote.

Subsequently, on November 16, 1994, the mayor wrote Cabrol a letter in which the mayor made clear his high displeasure with the continued presence of Cabrol's chickens. The following appears in the letter:

14

This may be the perfect time for you to move on to another occupation *if you do not agree with my philosophy.* November 30, 1994, I feel will give you ample time to get rid of your chickens. I am confident that you will do what will best serve you and the town. No matter what you do I will harbor no ill feelings and I hope that you don't, either.

(emphasis in the original). Cabrol, however, was defiant, and refused to get rid of his chickens. On November 29, 1994, the mayor notified Cabrol that he was being fired, effective the next day.

As previously stated, the majority found that the absence of proof of notice by Cabrol to the mayor of his opposition to the mayor's proposed amendment to the nuisance ordinance was fatal to Cabrol's First Amendment claim. There is, however, direct evidence in this case that the mayor knew that Cabrol had spoken out against the amendment. A letter that Cabrol's attorney sent to the mayor on November 18, 1994, twelve days before Cabrol was fired, reads as follows:

If someone under your employment is not doing a good job and/or is not representing the town in a manner which the town fathers disagree with, then certainly disciplinary action can be instituted, including termination; *however,* you cannot stick a gun to somebody's mouth and try to force them to do something that the laws of your town do not prohibit merely for political reasons. Several of the councilmen in your town voted against animal control laws within your town's limits, *and certainly Mr. Cabrol and his wife expressed their disagreement with those laws, as well.*

(emphasis added).

This letter supports the finding that the mayor was aware of Cabrol's expressions of opposition to the animal control amendment. Not until after this letter was sent to Cabrol did the mayor actually terminate Cabrol's employment. A reasonable jury could thus find that the mayor was aware of Cabrol's speech at the time he made his decision to fire Cabrol. Furthermore, this record evidence supports a finding that the mayor was not only aware of Cabrol's speech, but also fired Cabrol in retaliation for speaking against the amendment. Direct evidence of illegitimate intent is not required. *Tompkins v. Vickers,* 26 F.3d 603, 608-09 (5th Cir.1994). In this case, the improper motive of the mayor in firing Cabrol can be inferred from the record, including evidence of the mayor's attempt to pass an ordinance to outlaw Cabrol's chickens and Cabrol's role—*i.e.,* speaking against the proposed ordinance with fellow citizens—in defeating the mayor's proposal.

Cabrol has also met his summary judgment burden of establishing the other elements of his First Amendment claim. First, examining the content, form, and context of his complaints, Cabrol's

15

speech was clearly a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Tompkins v. Vickers,* 26 F.3d 603, 606-07 (5th Cir.1994). The fact that Cabrol spoke out against the proposed amendment as a participant in a widespread debate taking place throughout the Town of Youngsville supports this finding. *Id.* at 607. Cabrol's personal interest in the amendment does not dictate a contrary finding: an employee can have a mixed motive without defeating his First Amendment claim. *Thompson v. City of Starkville, Miss.,* 901 F.2d 456, 463 (5th Cir.1990). Moreover, Cabrol's speech constituted a public concern even though he may have expressed his opposition to the amendment only in private conversations with fellow citizens of the town. *See Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 413, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979).

Second, Cabrol's interest, as a citizen, in commenting on the amendment outweighs the interest of the mayor, as an employer, in promoting the efficiency of his governmental office. *Kinsey,* 950 F.2d at 992; *Davis v. Ector County, Tex.,* 40 F.3d 777, 783 (5th Cir.1994). The balancing test acts as a sliding scale, under which a stronger showing of disruption is necessary when the employee's speech, as here, involves a highly significant matter of public concern in the community where Cabrol resided. *Matherne v. Wilson,* 851 F.2d 752, 761 (5th Cir.1988). The mayor has the burden of producing evidence of disruption. *Moore v. City of Kilgore, Tex.,* 877 F.2d 364, 372 (5th Cir.1989), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989). As the mayor's assistant, Cabrol's duties were to read meters, maintain city utilities and streets, and handle citizen complaints related to utilities. The mayor has presented no evidence, and the record does not otherwise support a finding, that Cabrol's opposition to the proposed amendment hindered the ability of the mayor, Cabrol, or other Town of Youngsville employees to perform their duties. The mayor's mere dissatisfaction with Cabrol's opposition to the amendment a public debate on an issue of great importance to the community.

For the foregoing reason, I respectfully dissent.